566 So.2d 121 (1990)
AMERICAN MOTORISTS INSURANCE COMPANY
v.
AMERICAN RENT-ALL, INC., et al.
Rose Ann WALTON, et al.
v.
AMERICAN RENT-ALL, INC., et al.
Nos. 90-CA-137, 90-CA-138.
Court of Appeal of Louisiana, Fifth Circuit.
June 25, 1990.
Rehearing Denied September 25, 1990.
*122 Christovich & Kearney, Charles W. Schmidt, III, New Orleans, for American Rent-All, Inc., and Bruce Lee, defendants-appellants.
Law Office of Cerio A. DiMarco, Cerio A. DiMarco, Edward J. Lassus, Jr., New Orleans, for American Motorists Ins. Co., plaintiff-appellee.
Leonard J. Cline, Joseph H. McCusker, III, Metairie, for Rose Ann Walton, plaintiff-appellee.
Before CHEHARDY, C.J., and KLIEBERT and GAUDIN, JJ.
CHEHARDY, Chief Judge.
These consolidated actions arise out of a rear-end collision which occurred on February 5, 1985 in Harvey, Louisiana. Rose Ann Walton was driving a vehicle owned by her employer American Waste and Pollution Control Company when she was struck from the rear by a pickup owned by American Rent-All, Inc., and operated by its employee Bruce Lee.
American Motorists Insurance Company, the worker's compensation insurer of Mrs. Walton's employer, brought suit against defendants Bruce Lee, American Rent-All, Inc., and their liability insurers Hanover Insurance Company and Massachusettes Bay Insurance Company for recovery of statutory disability benefits paid and payable in favor of Mrs. Walton. In a separate suit Mrs. Walton and her husband Jeffery sued the defendants for tort damages.
The actions were consolidated and after extensive discovery were fixed for trial. The defendants stipulated to liability and the case proceeded to bench trial on the issue of quantum alone in June, 1989. The district court found in favor of plaintiffs on the tort claim and awarded $1,538,628.93 in damages. The judge also granted statutory recovery to the compensation insurer. Only that portion of the judgment which adjudicates the tort claims is appealed.
As a basis for the reversal or modification of the district court judgment, appellants[1] argue that: (1) Rose Ann Walton did not prove that her present psychiatric condition was caused by the rear-end collision; (2) plaintiffs' damage award is excessive; (3) interest which accrued between submission of the case for decision and the rendition of judgment should not be charged against defendants. After considered review we find that the first two arguments have merit and require us to reduce the district court judgment.

FACTS
From the evidence presented at trial the following profile of Rose Ann Walton emerges.
*123 Mrs. Walton has worked in the clerical field since 1963. She was employed by American Waste in 1972 for secretarial and accounting work. She transferred to the sales department in 1978 and by 1985 held the position of outside sales representative. Her job was to solicit and service customer accounts. It entailed extensive driving. Plaintiff made 12 to 15 field service calls per day. She was en route to service a customer account on the day of the accident.
On February 5, 1985 Mrs. Walton was the victim of a rear-end collision. When her car and Mr. Lee's pickup made contact she was jerked forward and snapped backward. She experienced the onset of neck and back pain.
Later that same day Mrs. Walton consulted her family physician Dr. Russell Rawls. She described the accident to him and reported complaints of upper back pain and a headache. The doctor's physical examination was positive for limited range of neck motion, and tightness and tenderness in the right trapezius muscle. Dr. Rawls diagnosed a cervical sprain with associated tension headaches and prescribed muscle relaxers and rest.
Mrs. Walton continued under Dr. Rawls' care without significant improvement. She reported increased discomfort in the neck though she experienced temporary relief with anti-inflammatory injections. Her examinations through March 1985 documented objective signs of injury. Dr. Rawls referred Mrs. Walton to orthopedic surgeon Dr. Mark Juneau.
Dr. Rawls testified that plaintiff had been under his care since August 1982 for chronic anxiety and periodic weight gain. He had medicated her with tranquilizers and prescribed diet pills to regulate her weight fluctuation. Prior to 1985, Mrs. Walton had never complained to him of neck pain; he related her neck injury to the rear-end collision.
Dr. Juneau's examination of plaintiff revealed full range of motion and no muscle spasm. He treated Mrs. Walton's complaints of neck pain with physical therapy and muscle relaxers through September 1985. Mrs. Walton testified that despite this conservative treatment she continued with neck and shoulder pain radiating to her arms. She felt that treatment by Dr. Juneau was not helping her and so consulted neurosurgeon Dr. Raymond Llewellyn.
Mrs. Walton came under Dr. Llewellyn's care in October 1985. She reported pain in the neck and shoulder radiating to her arm, which she related to the February 5, 1985 collision. On examination the doctor found neck spasm and decreased reflexes in her right arm. He diagnosed a muscle ligament strain. Because conservative treatment for eight months had not resolved Mrs. Walton's complaints the doctor considered the possibility of joint involvement and ordered additional testing.
Mrs. Walton's October 1985 CAT scan depicted a rupture at the C 5-6 and C 6-7 vertebral levels. The doctor recommended surgery which Mrs. Walton declined in favor of continued conservative treatment. She stated that she did not want to undergo the trauma of surgery or a lengthy recuperative period.
Mrs. Walton remained under Dr. Llewellyn's care on a physical therapy program through September 1986. Her pain increased. A January 1987 repeat CAT scan showed worsening of the ruptures. A concurrent myelogram showed swelling of the nerve root at C 5-6 and a defect in contact with the nerve structures at C 6-7. Mrs. Walton underwent a two-level diskectomy in March 1987.
While surgery left Mrs. Walton with a 15% anatomical disability, Dr. Llewellyn testified that he achieved an excellent result with the fusion. He was disappointed in Mrs. Walton's post-hospital progress. She continued with complaints of neck and right arm pain. The doctor testified that these complaints were psychiatric or somatic in origin. He stated that her obesity also hindered her ability to comfortably use her neck and arms. While he prohibited Mrs. Walton from climbing, bending and heavy lifting he placed no restrictions on her sitting or driving.
*124 Dr. Llewellyn related plaintiff's neck injury to the February 5, 1985 rear-end collision. Due to her physical injury he believed she could not work as an outside sales representative. He recommended continued physical therapy and a follow-up neurogical treatment.
On behalf of defendants, Ranjan Shety, a physical therapist, performed a muscular skeletal and functional capacity examination on Mrs. Walton in February 1988. On the basis of his testing and analysis of her range of motion and muscle strength he testified that plaintiff required a maximum of six months' physical therapy after which she could return to sedentary employment. He found her pain complaints to be grossly exaggerated.
At trial plaintiffs contended that the rear-end collision resulted in both physical and psychiatric injury. Defendants argued that Mrs. Walton's emotional instability predated the automobile accident.
From the early 1970's on Mrs. Walton was treated regularly for chronic anxiety-depression. In 1971 she was hospitalized by psychiatrist Dr. Elodie Braud for severe depression experienced at the death of a family member. When released she remained under Dr. Braud's care for psychotherapy and medication therapy. Plaintiff divorced, changed jobs and began to function independently. She appeared to be coping with daily life stress.
In 1977 Mrs. Walton was again hospitalized for a major depression following the dissolution of a romantic involvement. She received extensive in-patient therapy for six months. After discharge plaintiff again changed jobs. This time she transferred to the sales department of American Waste. She remarried and had a child. Mrs. Walton remained under Dr. Braud's care and on tranquilizers until April 1988. She was concurrently being treated and medicated by Dr. Rawls.
Dr. Braud testified that Mrs. Walton exhibited a borderline personality disorder, formerly labeled chronic schizophrenia. That is, she lacked coping responses to major stress episodes. Though she functioned adequately in response to the daily pressures of life, she could not handle major life stressors and became functionally incapacitated. Dr. Braud believed that Mrs. Walton's involvement in the automobile collision could have produced a major depressive episode.
Dr. Millard Jensen, psychiatrist, treated plaintiff beginning in June 1987 for anxiety-depression. Plaintiff saw Dr. Jensen weekly through April 1988 without improvement. She was then hospitalized for three weeks and was given intensive psychotherapy. Her response was poor; her depression increased.
Dr. Jensen testified that plaintiff had a passive dependent personality with strong compulsive features. While she was marginally functional in everyday life she experienced a period of regression each time a new stress was applied. Her coping ability decreased, her anxiety and depression increased; she became incapacitated.
At the time of trial the doctor's diagnosis was recurrent major depression with secondary obesity and drug dependency. He stated that Mrs. Walton was a chronic overeater and recommended continued psychiatric care to reduce plaintiff's dependency, weight and drug habit.
Dr. Jensen agreed that the February 1985 automobile collision created an emotional stress that could have triggered the manifestation of plaintiff's underlying personality disorder. However, job stress, the fear of below par performance and the threat of losing one's job would produce the same result. The doctor believed that the prognosis for plaintiff's return to work in the sales field was poor.
Dr. Remy Culver, psychiatrist, examined plaintiff in May 1988 on defendants' behalf. He agreed with the diagnosis of borderline personality disorder and believed that Mrs. Walton exhibited chronic instability with a recurrent tendency toward depression. In his opinion plaintiff had severe long-standing problems with anxiety-depression. She displayed steady marginal functioning but experienced psychotic episodes where her functional ability decreased markedly.
*125 The doctor agreed that plaintiff had a passive dependent personality with a compulsive component. The February 1985 collision when superimposed on plaintiff's underlying personality disorder allowed Mrs. Walton to place herself into a position where her emotional dependency needs could be met. Rather than dealing with her emotional dysfunction she could focus on what she perceived as physical pain as the reason for her anxiety depression. As of trial he believed that Mrs. Walton required continued psychotherapy.
Bobby Roberts, vocational evaluation specialist, performed functional testing on plaintiff in January and April 1988. He found that Mrs. Walton had difficulty in sitting and in using her extremities. Roberts recommended comprehensive in-patient therapy for a six-month minimum. He testified that her medicated state had hindered her performance on the functional testing and recommended treatment for drug dependency and obesity.
Robert Voogt, a rehabilitation specialist, tested plaintiff in January and June 1988. He found her to have neck and shoulder pain that limited her functional ability. He believed that Mrs. Walton's psychiatric reaction to the pain disabled her. But he believed that with counseling and pain management therapy she could return to a part-time desk job.
Mrs. Walton testified that prior to the automobile accident she enjoyed the challenge of the sales field, traveling, and dealing with customers. After the collision she remained employed until June 1986. Her neck and arm pain increasingly limited her job performance. She took heavy medication and began to miss work. Driving became difficult; she fell behind in her paperwork. This reduced her productivity in sales. By June 1986 she and her employer agreed that she should stop working. At trial Mrs. Walton explained:
"Q. And, who eventually made the decision and told you not to come back to work?
"A. I think the company. I don't recall exactly, but I think when I called in that Bobby Bourgeois told me that he thought it might be best that I go on Workmen's Compensation for a while."

I
The trial court awarded damages as follows:

Past Medicals $ 63,996.93
Future Medicals 10,500.00
Future Psychiatric Cost 148,000.00
Vocational Rehabilitation
 Center Cost 135,000.00
Past Lost Wages 62,439.00
Past and Future Physical
 Pain and Suffering 300,000.00
Past and Future Mental
 Anguish and Distress 300,000.00
Future Lost Wages 518,693.00
 _____________
 TOTAL $1,538,628.93

On appeal defendants contend that Mrs. Walton did not prove that her current psychiatric dysfunction was caused by the February 1985 rear-end collision. Therefore the court committed reversible error in awarding inflated mental anguish damages and psychiatric treatment and vocational rehabilitation center costs. We agree.
On review we are obliged to examine the record to insure against the presence of manifest error in the district court decision. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). That is, we are charged to determine whether the district judge was justified in his factual conclusions. Therefore we cannot accept these factual conclusions simply because there exists some evidence to support them. This is particularly true when the trier of fact refused to accept as credible a preponderance of uncontradicted testimony and where the record indicates no sound reason for its rejection. Mart v. Hill, 505 So.2d 1120 (La.1987).
Our examination of the record compels the conclusion that the trial judge was clearly wrong in finding that Mrs. Walton's psychiatric dysfunction was caused by the automobile collision. This reasoning is blatantly contradicted by both medical and lay testimony in the record.
Plaintiff has the burden of proving by a preponderance of the evidence damages caused by the defendants' fault. The law recognizes that a medical condition producing *126 disability is presumed to have resulted from an accident if before the accident the injured person was in good health but shortly after the accident the disability causing condition manifested itself, provided there is a reasonable possibility of a causal connection between the accident and the condition. In order for the presumption to apply, plaintiff must prove a causal nexus between the accident and the illness. Sanders v. State Farm Mut. Auto. Ins. Co., 516 So.2d 1162 (La.App. 2 Cir.1987). Mrs. Walton has not met this burden of proof.
There is no real conflict in the medical evidence. Drs. Braud, Jensen and Culver all agreed that plaintiff's borderline personality disorder pre-dated the accident. Dr. Culver testified that Mrs. Walton had severe, long-standing problems with anxiety-depression. Dr. Jensen characterized plaintiff's condition as "chronic", a term which in medical parlance denotes a disease of long duration and slow progress. T.L. Stedman, Stedman's Medical Dictionary (24th ed., 1982). Mrs. Walton functioned marginally on a daily basis and regressed in response to stress.
The testimony does not preponderate in favor of a causal link but against it. Mrs. Walton was not "in good health" at the time of the accident. Since 1971 she had been under treatment for recurrent severe emotional disturbances. For three years prior to the accident she was under the regular care of two physicians and was continually taking prescribed narcotic medication for depression and obesity. Further Mrs. Walton's incapacity did not manifest itself immediately after the accident. She returned to work two weeks after the collision and remained employed for the following 16 months. The trial judge was clearly wrong in finding that Mrs. Walton's borderline personality disorder was caused by the February 1985 rear-end collision. Jordan v. Hubbard, 541 So.2d 211 (La.App. 4 Cir.1989); Fuqua v. Gulf Ins. Co., 542 So.2d 211 (La.App. 3 Cir.1989).
The record does support the conclusion that the accident caused the underlying symptoms of Mrs. Walton's personality disorder to surface or manifest themselves. After the collision plaintiff's anxiety-depression increased. Mrs. Walton is entitled to recover for this aggravation of a pre-existing condition. Sciortino v. Alfano, 435 So.2d 1010 (La.App. 5 Cir.1983).
The district court awarded Mrs. Walton $300,000 in damages for mental distress. We find this to be an abuse of discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). Considering the particular facts and circumstances of the case we believe that the award is excessive and therefore are obliged to reduce it to the highest point reasonably within the trial court's discretion.
Both before and after the accident Mrs. Walton was treated for exactly the same illnesses: personality disorder, anxiety-depression, and obesity. The only difference in the pre- and post-accident diagnosis was made by Dr. Jensen, who characterized plaintiff's most recent condition as a major depression. Our survey of reported jurisprudence granting damage judgments for torts that aggravate a depressive tendency in a pre-disposed patient convinces us that $50,000 is the most that the trial court reasonably could have awarded. Mrs. Walton's award for past and future mental anguish and distress is reduced from $300,000 to $50,000. Alphonso v. Charity Hosp. of Louisiana, Etc., 413 So.2d 982 (La.App. 4 Cir.1982); Burns v. Fernandez, 401 So.2d 1033 (La.App. 4 Cir.1981).
The district court awarded Mrs. Walton $148,000 for future psychiatric costs and $135,000 for vocational rehabilitation center costs. This was error. Testimony as to the need for this treatment was hinged on the contention that plaintiff was psychiatrically disabled by the accident. We have pointed out the fallacy of this conclusion.
Mrs. Walton required therapy and medication for her psychiatric disorder both before and after the accident. Therefore she is not entitled to a separate damage award for future psychiatric costs. The award for this item of damage is reversed and disallowed. Insofar as plaintiff requires additional psychotherapy for the accident-caused exacerbation of her emotional frailty *127 the award of $10,500 in future medical expenses is adequate and is affirmed.
The award of costs for future vocational rehabilitation is also disallowed. Both plaintiff's experts Roberts and Voogt testified that Mrs. Walton was psychiatrically disabled and required a long-term in-patient regime of psychotherapy. Neither of these well-qualified gentlemen is a licensed psychiatrist. Their recommendation for in-patient treatment also resulted from their concern over Mrs. Walton's obesity and drug dependency. However Mrs. Walton's weight fluctuations and addiction to prescribed medication from 1981 forward is well documented in the record. Defendants are not responsible to cure plaintiff's pre-accident illnesses. The award for the costs of vocational rehabilitation is reversed.

II
Defendants contend that the general and special damage award to Mrs. Walton and her husband is excessive and is not supported by the evidence. While they dispute most aspects of the award, the major thrust of defendants' objection is directed against recovery for physical pain and suffering, future economic losses and consortium. We agree that these awards are abusively excessive.
As a result of the accident Mrs. Walton sustained a two-level disc injury for which she underwent a fusion. Dr. Llewellyn felt that he had achieved a good result with the surgery and was disappointed in Mrs. Walton's poor progress and continued complaints of neck pain. By November 1988 he believed that Mrs. Walton could function physically in a sedentary employment but that the strong psychiatric component to her pain hindered her ability to do so. Rehabilitation specialists testified that Mrs. Walton's functional ability was limited by her obesity and medicated state.
With Dr. Llewellyn's agreement plaintiff return to work in the sales department of American Waste in January 1988. Mrs. Walton testified that she lasted seven days but discontinued her job because sitting for five hours a day at the telephone without a high-backed chair to support her neck aggravated her neck pain. Plaintiff testified that she could not do housework because of her weight. Constant neck pain prevented her return to any job.
We believe that the physical pain and suffering award of $300,000 is excessive. With the psychiatric component removed from Mrs. Walton's complaints it is evident that her physical pain was limited in nature. According to the record Mrs. Walton has not been actively treated by a neurosurgeon or orthopedic surgeon since her 1987 surgery. At trial Dr. Culver testified that plaintiff's pain complaints were somatic, emotional rather than physical in origin. The award for physical pain and suffering is reduced from $300,000 to $50,000. Wolfshohl v. Boudreaux, 482 So.2d 954 (La. App. 3 Cir.1986).
Defendants object to the trial court's award of past and future lost income. They contend that the trial court erred in accepting the testimony of plaintiff's economist Dr. Melville Wolfson rather than defendants' economist Dr. J. Stuart Wood.
Economic losses cannot be calculated with mathematical exactitude but only by such proof as reasonably establishes the claim. Robinson v. Graves, 343 So.2d 147 (La.1977). The trier of fact is not obliged to strike a balance between the economic estimates offered by plaintiff and defense. He is charged to award such amount as, all circumstances considered, is just compensation. It is his perrogative to accept the testimony of one witness over another if that economic evaluation is reasonably supported by the evidence.
On the basis of 1983 statistics, Dr. Wolfson found that 44-year-old Mrs. Walton had a 16.1 year work-life expectancy from the date of trial to retirement. Based on 1985 and 1986 income tax returns he calculated plaintiff's average yearly income at $31,306. He testified that Mrs. Walton's economic loss from the accident through trial, exclusive of earnings, totalled $62,439.
The doctor then used the average income along with a 5.6% inflation rate and a 7.5% *128 discount factor to estimate plaintiff's loss of future earning capacity at $417,693. He was additionally provided with plaintiff's 1985 employee benefit booklet which documented that Mrs. Walton enjoyed fringe benefits, including health and accident insurance and participation in a profit sharing plan, which equalled 24.26% of her earnings. Dr. Wolfson calculated plaintiff's fringe benefit loss at $101,000 for a total future economic loss of $518,693.
Assuming that Mrs. Walton returned to work at minimum wage and continued to enjoy a benefits package, her future losses totalled $324,298. If her benefits were not reinstituted her loss totalled $424,298.
Based on 1986 statistical data Dr. Wood assessed Mrs. Walton's work-life expectancy from date of trial to retirement at 11.16 years. He believed that Dr. Wolfson's figure was incorrect in that it failed to take into account variable economic factors such as lay-offs and changes in jobs which account for a reduction in actual employment time. On cross-examination the doctor admitted that he had no information on the consistency of Mrs. Walton's employment prior to 1981.
Dr. Wood averaged plaintiff's 1981-1985 income to calculate her average yearly income at $24,417. He estimated plaintiff's past economic loss at $49,937. Applying an 8.5% discount rate and allowing for inflation he estimated plaintiff's future economic loss at between $164,284 and $191,101 with no recovery of fringe benefits.
The trial court's award of $62,439 in past wage losses is affirmed. We find however that the trial judge committed clear error in finding Mrs. Walton unemployable and in awarding her future economic losses for total disability. The preponderance of medical testimony supports the conclusion that, even with her physical limitations Mrs. Walton is employable in a sedentary capacity in a clerical or secretarial capacity for which she is well qualified. We therefore reduce the district court award to $324,298 in future lost wages.
The district court abused the much discretion afforded it in awarding $55,000 in consortium losses to Jeffery Walton. The testimony offered at trial to support this item of damage consisted of the husband's comment that since the accident he does all of the housework and cares for the minor child. He testified that he and his wife do not make love at all as he is afraid of hurting his wife. He finds her unresponsive due to the medication she takes. Mrs. Walton testified, ""Our sex life is not the best." There was also testimony that the birth of their son and the presence of Mrs. Walton's mother in the family home imposed stress on the marriage prior to the accident.
A compensable consortium claim exists. The testimony documents however that the accident had only a minimal rather than significant effect on the Waltons' lifestyle. Compare Mercer v. Fruehauf Corp., 492 So.2d 538 (La.App. 3 Cir.1986). The $55,000 award is clearly excessive and is reduced to $10,000. Sexton v. Louisiana Vacuum Services, Inc., 506 So.2d 780 (La. App. 1 Cir.1987).
Defendants do not dispute Mrs. Walton's recovery of past medical expenses. This award is affirmed.

III
Defendants' final assignment of error challenges the interest award.
In all suits arising "ex delicto", interest is awarded from the date of judicial demand. LSA-R.S. 13:4203. The original petition was filed by American Motorist Insurance Company on January 29, 1986. Trial on plaintiffs' tort and compensation claims was held on June 27-June 29, 1988. Judgment in plaintiffs' favor was rendered on June 30, 1989.
It is now June 1990 and over five years of interest is pending on the judgment. Defendants submit that they should not be cast for the interest which accrued between the time the case was submitted, LSA-R.S. 13:4207.1, and the entry of judgment because the one-year time lapse is solely attributable to judicial delay.
The case took three years to ready for trial. The time span accommodated counsels' *129 schedules and facilitated extensive pre-trial discovery. Now defendants' counsel would have us characterize the district judge's conduct as unreasonable and arbitrarily select a date on which he should, equitably, have rendered judgment.
Counsel points to no authority, and we are aware of none, which would allow us to "carve out" and reverse a portion of the judgment on these facts. Nor in this instance are we charged with overseeing the progress of the district court's docket or instructing the trial judge in his job. Defendants' assignment of error has no merit in this forum. Their remedy lies elsewhere. LSA-R.S. 13:4210.

DECREE
For the reasons assigned the award of future psychiatric and vocational rehabilitation center costs in favor of Rose Ann Walton is reversed.
The damage award in favor of Rose Ann and Jeffery Walton is amended and recast as follows:

Past medicals $ 63,996.93
Future medicals 10,500.00
Past lost wages 62,439.00
Past and future physical pain
 and suffering 50,000.00
Past and future mental anguish
 and distress 50,000.00
Future lost wages 324,298.00
Consortium losses 10,000.00
 ___________
 TOTAL $571,233.93

As amended, the damage award is affirmed. Costs are assessed against appellants.
AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.
NOTES
[1] Judgment was entered against Bruce Lee, American Rent-All Inc., and Massachusettes Bay Insurance Company. Appellants are Lee, American and Hanover Insurance Company, the parent company of Massachusettes.