**VIRGINIA L. GIBBONS, Plaintiff**

**v.**

**AMERICAN SAMOA GOVERNMENT,**
**and DOES I through 10, inclusive, Defendants.**

High Court of American Samoa
Trial Division

CA No. 128-93

March 12, 2001

Before KRUSE, Chief Justice, and TUAOLO, Chief Associate Judge.

Counsel: For Plaintiff, Aumoeualogo S. Salanoa, William H. Reardon
For Defendant American Samoa Government, Fiti A. Sunia,
Assistant Attorney General

OPINION AND ORDER

## I. Background

On February 16, 1992, Virginia Gibbons ("Gibbons") was beaten and sexually assaulted at her home in the government housing complex in Tafuna by Maosi Fuala`au, a prisoner who had escaped from the government's Correctional Facility in Tafuna. The prisoner had been incarcerated for a previous sexual assault in the same housing complex. Gibbons brought suit against the American Samoa Government ("ASG" or "the government") to recover damages for injuries she sustained as a result of the attack.

On February 2, 1998, the Court bifurcated the trial into two phases. The first phase ("Trial I") dealt solely with liability. In its Opinion and Order dated April 26, 1999, the Court rejected ASG's argument that it was immune under the Government Tort Liability Act, A.S.C.A. § 43.1203, and held ASG liable in its capacity as custodian of the prison for negligently failing to prevent the prisoner from escaping from the Correctional Facility and sexually assaulting Gibbons. The Court found ASG negligent in its operation of the Correctional Facility by providing inadequate security. ASG was deemed not liable as the landlord of the government housing complex in Tafuna.

38

Having found liability in the first phase of this case, the issues before the Court involve only the proper measure and amount of damages.

## II. Causation

 ASG argues that it is not responsible for injuries inflicted by a third party. However, to be liable for negligent conduct, a party's actions must be a "substantial factor in bringing about the harm." RESTATEMENT (SECOND) OF TORTS, § 431 (1965). Even when another party's actions are a cause of harm, that party is not absolved of responsibility if its negligent action creates the foreseeable risk of harm and is a substantial factor in causing the harm. *Id.* at § 442A.

In the first phase of this case, the court found that Gibbons was injured as a result of ASG's negligence and that preventing such injuries was within the scope of the duty breached by ASG. *Gibbons v. Am. Samoa Gov't*, 3 A.S.R.3d 135, 138-44 (Trial Div. 1999). The Court has therefore already found that ASG proximately caused Gibbons' injuries, and we decline to revisit this issue in the damages phase of trial.

## III. General Damages

Gibbons is entitled to an award for general damages. While most of the cases in the Territory have involved primarily physical, rather than emotional, injuries, they are instructive in determining a fair award.

Nine years ago, the Court assessed awards in the Territory by stating, "fairly mild injuries frequently result in awards or settlements in the range of $10,000, but even the most serious and painful injuries rarely result in awards over $50,000." *Moors v. Am. Samoa Gov't*, 19 A.S.R.2d 67, 68-69 (Trial Div. 1991). Even in cases of serious injury, *general damages in the Territory rarely rise to the amounts awarded in* other American jurisdictions. *See Kim v. Star-Kist Samoa, Inc.*, 8 A.S.R.2d 146, 151 (App. Div. 1988). General damages depend on the particular circumstances of the case, and awards vary significantly even in cases of serious injuries. In *Moors*, the Court assessed damages for the permanent loss of use of an eye by a child, future eye surgery, and possible minor permanent disfigurement. The Court considered the loss of an eye a serious injury regardless of actual pain and suffering, and awarded the plaintiff $20,000. *Moors*, 19 A.S.R.2d at 68 (figure prior to decrease for plaintiff's negligence). In contrast, the Court in *Kim* awarded $80,000 to a fisherman whose injuries included facial lacerations and contusions, a crushed rib cage, and fractures in his cheek bone, eye socket, femur, and pelvis. *Kim*, 8 A.S.R. 2d at 150-51. The *Kim* award was one of the largest awards for pain and suffering in the Territory up to that time. *Id.* at 151.

In *Masania'i v. The Country Club*, 2 A.S.R.3d 120, 131 (Trial Div. 1998), the Court awarded $100,000 in general damages, including pain and suffering. In deciding on this amount, the Court considered plaintiff's past and present circumstances, including the fact that the plaintiff, previously a gainfully employed police officer, was rendered unable to care for himself. *Id.* The Court also considered his bleak prognosis, uncertain future, and multiple debilitating injuries. *Id.*

This Court has considered the extent of both the physical and emotional injuries Gibbons has suffered as a result of the attack against her, including her PTSD and depression (as discussed below), her inability to return to her career, her difficulty in relationships with people, and her uncertain prognosis. The Court awards Gibbons $100,000 in general damages.

## IV. Special Damages

In addition to general damages, Gibbons makes a number of claims for special damages, including for medical treatment for physical and emotional injuries, lost wages, and lost leave. These are considered as follows.

### A. Physical Injuries

Gibbons' physical injuries were discussed in Trial I. There is no question that the assault caused Gibbons' physical injuries, which included many scratches and bruises to her mouth, neck, chest, shoulders, arms, thighs and vagina. (Trial I Ex. 11, Gibbons Medical Report, dated February 20, 1992). Gibbons has not requested damages for treatment of these physical injuries, probably because American Samoa's LBJ Medical Center only assesses minimal charges for resident care.

Gibbons has, however, requested damages for off-island medical treatment. She has submitted medical bills from 1992 for tests she underwent for AIDS and other sexually transmitted diseases and infections in Honolulu, Hawaii, at a cost of $354. (*See* Trial II Ex. 14, Physical and Mental Health Treatment Related Expenses at 1 (summarizing expenses by category and year).) The Court accepts that the tests for AIDS and other sexually transmitted diseases were necessitated by the rape, and we find that Gibbons is entitled to reimbursement for these expenses.

Gibbons has also stated that she received internal injuries consisting of a contusion and a possible rib fracture. She submitted bills from treatment by Lie-Ping Chang, D.O., FACGP for osteopathic manipulation, treatment described as "OMT, additional region," and various laboratory

tests. (Trial II Ex. 11.) The summary of expenses indicates that Chang's treatment was for musculo-skeletal symptoms involving pain in the jaws, neck, chest and spine, muscle spasm and restricted range of motion in the joints. She had numerous appointments with Chang, totaling $3,220.50. (Ex. 14.) These injuries were not listed on Gibbons' medical report, and Gibbons has not submitted evidence from a treating physician or other medical professional diagnosing these injuries. The Court thus finds insufficient evidence to award damages.[1]

Gibbons also underwent monitoring and regulation of preexisting thyroid and diabetes medications from a Dr. Ramey. According to Gibbons' testimony, this treatment occurred due to interaction of the thyroid and diabetes medication with the antidepressant medications. The cost for this treatment totaled $2,463. (Ex. 14.) The Court also has insurance claim forms from Dr. Ramey in evidence. (Trial II Ex. 11.) Gibbons had hypothyroid and diabetes prior to the rape. *See infra.* Gibbons did not submit medical evidence that antidepressants made changes in her thyroid and diabetes medication necessary or that this was the reason Dr. Ramey treated her. Having no evidence tying Gibbons' treatment by Dr. Ramey to injuries she suffered as a result of the attack against her, the Court finds insufficient evidence to award damages for this treatment.

The Court therefore grants damages for treatment of physical injuries in the amount of $354.

B. Emotional Injuries

Gibbons claims that she suffers from Posttraumatic Stress Disorder ("PTSD") and major depression as a result of the assault for which ASG is liable. She further claims that these emotional injuries have severally incapacitated her and rendered her almost completely unable to work. We review the relevant portions of Gibbons' personal history, assess two bases for evaluating Gibbons' condition (one expert witness, one treatise), address whether Gibbons suffers from PTSD and depression, and finally, we discuss whether Gibbons' emotional problems were caused by the attack for which we have held ASG liable.

1. Facts

Gibbons attended law school at George Washington University in

---

[1] We noted buried in discovery materials in file #3, several Health Benefits Claim Forms for treatment by Chang. In one, Gibbons lists the date of accident as the date of the rape (2/16/92); in a later one, she lists the diagnosis as a slip and fall at home on 4/19/95. Some treatment was before the slip and fall and some was after.

Washington D.C., graduating in 1976. She then began a job at the Environmental Protection Agency ("EPA"), and thereafter held other jobs with the federal government. Just prior to coming to American Samoa, Gibbons was a supervisory attorney and acting deputy director in the Legislative Counsel Office in Washington, D.C.

Gibbons came to American Samoa in 1989 for a two-year contract as an environmental attorney in the Attorney General's office. After two years and three months, she was asked by the Attorney General to stay for an additional year, and she accepted the extension. The attack against Gibbons occurred during this additional year, and Gibbons left American Samoa in August 1992, after a two-month extension to the one-year extension. She returned to her job in the States, and stayed at that job until she was granted disability retirement in January 1995. Since that time, she has held one job, as a receptionist, for six months in 1997. Gibbons indicated that prior to the rape, she never received complaints about her job performance, either at the Attorney General's office here or in her previous jobs in the States.

After the incident, however, acting Attorney General Arthur Ripley criticized her for being too involved in her work. Gibbons acknowledges that she became forgetful, unable to prioritize, and unable to effectively handle her caseload. According to Dr. Postman's assessment, Gibbons was irritable, did not get along well with people, and forgot the details of certain events. These problems led to Gibbons' decision to return to work in Washington, D.C.

It appears that Gibbons continued to have difficulties at work upon return to the States. She was forgetful, erratic, unreliable, often teary, and did not get along with her boss. Gibbons indicated that her new supervisor at the EPA was unsympathetic to her state of confusion and forgetfulness. As a result of her problems, Gibbons was granted disability retirement in January 1995. Gibbons later took a job as a medical receptionist, but was fired on or about August 13, 1997, after approximately six months, because of being sick too much.

*2. Assessment of Expert Witness*

Dr. Louise Y. Postman ("Dr. Postman") is a psychiatrist who has treated Gibbons extensively. She graduated from Boston University School of Medicine in 1965, and has been practicing psychiatry exclusively since 1966. The Court qualified Dr. Postman as a medical expert with no objection from ASG.

Dr. Postman began treating Gibbons in June 1993, at which time someone named Dr. Lazar was also treating Gibbons. From June 1993 to

June 1994, Dr. Postman treated Gibbons through Psych Systems of Bethesda, Maryland, in a partial hospitalization program involving daily outpatient therapy. She ran the group therapy for trauma victims in which Gibbons participated, and treated Gibbons in individual psychotherapy sessions. She also managed Gibbons' medication throughout and after discharge from Psych Systems. Since 1995, Dr. Postman has been Gibbons' only psychiatrist and medicator.

Dr. Postman has treated Gibbons with a number of different anti-depressants. Dr. Postman testified that most medications were able to "get her to a higher therapeutic level" but had serious side effects, such as increased anxiety when she was on Prozac. As of Trial II, Gibbons was taking an antidepressant called Wellbutrin, which gave her fewer side effects than most of the other medications she has tried.

ASG questions the reliability of Dr. Postman's testimony, arguing that she is biased because she will financially benefit from any recovery Gibbons receives. The concern may be real in such cases. Nonetheless, as Gibbons' primary psychotherapist, Dr. Postman is uniquely qualified to discuss Gibbons' condition, and we find her testimony credible. Further, in the absence of any psychiatric testimony contradicting Dr. Postman's analysis, we have no foundation for disputing her diagnoses.

*3. Judicial Notice of Learned Treatise*

 Dr. Postman relied on the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, commonly known as DSM-IV, in describing Gibbons' psychiatric conditions generally. AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 424 et seq. (4th ed. 1994) (hereinafter "DSM-IV"). An expert witness may use statements in a medical or other learned treatise when the treatise is established as a reliable authority by the testimony of the witness, by other expert testimony, or by judicial notice. T.C.R.Ev. 803(18) (hearsay exception for learned treatises). The DSM-IV extensively describes the features of PTSD and major depressive disorder. It is a widely used resource in the mental health field, and its use in connection with Dr. Postman's testimony was without objection by defense. We therefore take judicial notice of DSM-IV as a learned treatise. *See United States v. Murdoch*, 98 F.3d 472, 479 (9th Cir. 1996) (Wilson, J., concurring); *United States v. Cantu*, 12 F.3d 1506, 1509 (9th Cir. 1993).

*4. Posttraumatic Stress Disorder*

Gibbons claims that she suffers from PTSD as a result of the attack against her. PTSD is an anxiety disorder with three primary

characteristic symptoms: (1) persistent re-experience of the traumatic event through unwanted memories or dreams; (2) psychic numbing and avoidance of stimuli associated with the trauma; and (3) syndrome persistent arousal, which may entail sleep difficulties, irritability or outbursts of anger, and difficulty concentrating. PTSD occurs "following an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury, or other threat to one's physical integrity." DSM-IV at 424. Sexual assault and physical attack are listed as traumatic events that can potentially lead to PTSD. *Id.* Social supports, earlier life experiences, personality variables, and preexisting mental disorders may influence the development of PTSD, which can also develop in individuals without any predisposing conditions. DSM-IV at 426-27. According to Dr. Postman, the severity assault and the way a victim experiences an assault may affect the severity of PTSD.

Dr. Postman has diagnosed Gibbons with PTSD. She stated that, as is common with sufferers of PTSD, Gibbons is unable to control her emotions and has suffered flashbacks of the rape. (Trial II Ex. 6, Doctor's Notes, July 14, 1999). Dr. Elisaia, who is the Chief of Psychiatric Services at the LBJ Medical Center in American Samoa, saw Gibbons several times in 1992 in the months following the rape, and also diagnosed Gibbons as having the symptoms of PTSD.

*5. Major Depressive Disorder*

Gibbons also suffers from major depressive disorder ("depression"). Depression is defined in terms of depressive episodes, defined by DSM-IV as at least a two-week period in which the person is either in a depressed mood or suffering a loss of interest or pleasure. DSM-IV at 327, 339. A depressive episode is characterized by at least five of the following nine features nearly every day: depressed mood most of the day, diminished interest in pleasure in all or most activities most of the day, significant weight change, insomnia or hypersomnia, psychomotor agitation or retardation, fatigue or loss of energy, feelings of worthlessness or excessive or inappropriate guilt, diminished ability to think or concentrate or a feeling of indecisiveness, and recurrent thoughts of death or suicidal ideation or action. *Id.* at 327. Depression can be one symptom of PTSD, and sufferers of PTSD are at an increased risk of several disorders, including major depressive disorder.

From the testimony of both Dr. Postman and Gibbons, Gibbons has suffered and presently suffers from many of the symptoms listed above. Soon after the rape, she had difficulty concentrating, could no longer become motivated when she woke up in the morning, and often felt confused. She had difficulty prioritizing and was unable to do her job

44

satisfactorily. Dr. Postman's testimony and notes indicate depression throughout Gibbons' treatment.

Mental health professionals use a multiaxial system for diagnosing mental disorders. *See* DSM-IV at 25. Axis V is a "Global Assessment of Functioning", which is scaled from 0 to 100. *Id*. at 30-31. DSM-IV describes scores between 21 and 30 as characterized by "inability to function in almost all areas." *Id*. at 32. Dr. Postman scored Gibbons at 25 in both in 1998 and 1999. According to Dr. Postman, Gibbons is unable to care for herself and cannot be counted on to get much done.

Her opinion is that Gibbons still suffers from major depression, several years after the rape. Most of the medications have had a positive effect, but Gibbons still has difficulty functioning. Dr. Postman indicated that Gibbons has made some progress, and there are moments when she is less depressed. However, she also stated that the times when Gibbons is in a less depressed state are "intermittent and can't be counted on."

*6. Preexisting Conditions*

ASG disclaims liability for Gibbons' emotional problems, arguing that these are caused by certain preexisting conditions concerning (a) poor health and (b) personal history. These arguments are considered in turn.

(a) POOR HEALTH

Gibbons suffers from both diabetes and hypothyroid, both of which conditions existed prior to the 1992 attack. Hypothyroid is a permanent condition in which the body produces an incorrect amount of thyroid, a hormone which affects emotional response. Evidence has not been presented regarding whether these conditions sufficiently influenced Gibbons' emotional state prior to the attack in question. Indeed, Dr. Postman's testimony indicates that Gibbons' thyroid level was normalized by medication.

ASG argues, pointing to Dr. Postman's therapy notes, that Gibbons was not diligent in taking her medication regularly, and that this amounts to a failure by Gibbons to minimize the emotional effects of the attack against her. However, Gibbons' expert testimony indicates that lack of motivation and difficulty completing tasks may be symptomatic of depression, rather than causes thereof.

We will not reduce Gibbons' recovery for emotional injuries based on pre-existing conditions. We note that ASG is not liable for thyroid and diabetes treatment that occurred subsequent to the rape, since these conditions were not caused by the rape.

## (b) PERSONAL HISTORY OF DEPRESSION

 ASG asserts that Gibbons was at least partially depressed prior to the attack against her, and as such, it should not be held liable for causing all of her consequent depression. *Montalvo v. Lapez*, 884 P.2d 345, 362 n.16 (Haw. 1994) (defendant not liable for pre-existing injury, but liable for aggravating it). If plaintiff was healthy prior to the incident and the injury appeared shortly afterward, her disability is presumed to have been caused by the incident if she can prove a causal nexus between the incident and her illness. *Am. Motorists Ins. Co. v. Am. Rent-All, Inc.*, 566 So. 2d 121, 125-26 (La. 1990) (accident aggravated, but did not cause, emotional injury).

 A threshold inquiry is "whether a plaintiff has 'fully recovered' from a pre-existing condition or injury or whether such condition was 'dormant' or 'latent.'" *Montalvo*, 884 P.2d at 362. If Gibbons had not fully recovered from prior depression at the time of the rape, the court should attempt to apportion the causes of her injuries. *Id*; *Prestenbach v. La. Power & Light*, 638 So. 2d 234, 245 (La. 1994). However, if Gibbons had fully recovered, or if her depression was dormant or latent, then ASG is liable for all damages legally caused by the incident, since plaintiff would not have incurred any medical expenses or suffering at all if the incident had not happened. *Montalvo*, 884 P.2d at 361. This is a question of fact for which medical testimony is appropriate. *Id.* (citing *Matsumoto v. Kaku*, 484 P.2d 147 (1971) (Levinson, J., dissenting)).

Prior to the rape, Gibbons had two episodes of depression. The first occurred many years ago at time of her separation and divorce. The second occurred in 1985, and is explained by Dr. Postman as an incorrect dosage of thyroid medication.

 According to both Gibbons and Dr. Postman, neither these issues nor her prior depressive episodes interfered with Gibbons' functioning during the period preceding the rape. The evidence supports this fact. While Gibbons may have been more susceptible to depression than the general population, she was not depressed at the time of the injury, had recovered from previous episodes of depression, was not chronically depressed, and did not need therapy or medication during the period immediately preceding the rape. *See Am. Motorist Ins. Co*, 566 So. 2d at 126.

ASG has failed to prove its hypothesis that other potential factors mentioned in therapy made Gibbons depressed prior to the rape, including feelings of rejection from her upbringing and failed relationships, or a grandfather with depression. Specifically, ASG has failed to show that these issues had any causal connection to Gibbons' depression, and has failed to discredit Gibbons' and Dr. Postman's

testimonies to the contrary.

*7. Conditions Subsequent to the Rape*

ASG argues that Gibbons' PTSD and depression did not arise until several months after the attack, and that these emotional injuries are too remote from the initial injury for it to be found liable.

It is true that more serious of Gibbons' psychological conditions did not appear until some time after the assault. Gibbons continued to work long hours at her job for several months and remained for two months past the expiration of her contract. She saw Dr. Elisaia, the Chief of Psychiatric Services at the LBJ Medical Center, approximately four times for treatment in July and August of 1992, but at some point believed she did not need psychological treatment and cancelled a therapy appointment with Dr. Elisaia. Gibbons did seek treatment in April and June of 1992, to attend one-week clinics at a rape crisis center in Honolulu, Hawaii. Gibbons' main goal in visiting the rape crisis center was to gather information in order to convict the rapist, but she visited counselors two to three times during each visit. Dr. Postman has testified that rape is a common antecedent to PTSD. Although PTSD usually begins within the first three months after the trauma, there may be a delay of months or years before symptoms appear. DSM-IV at 426. There were approximately six months, from February 1992, to August 1992, between the attack against Gibbons and her return to the States. During that time, Gibbons had already begun to display signs of emotional problems, such as significant difficulty at work and difficulty concentrating. Dr. Elisara indicated that she had symptoms consistent with PTSD, and Dr. Postman stated that the sexual assault was what caused Gibbons' PTSD. We find that the remoteness of Gibbons' symptoms from the time of the assault does not, therefore, indicate a breach in the causal logic.

ASG further argues that Gibbons' return to the States, rather than the rape, caused her emotional injuries. ASG argues that Gibbons was ultimately unable to work because of adjustment difficulties with her job at the EPA, including the treatment she received at work, rather than depression.

█ The established rule is that a plaintiff may recover for all damages, including those caused by a subsequent aggravation of an injury, if the later aggravation is a likely result of the original injury. *Henderson v. United States*, 328 F.2d 502, 504 (5th Cir. 1965) (applying Federal Tort Claims Act).

We have accepted expert testimony that Gibbons suffered from PTSD and depression when she returned to work at the EPA. We now accept

47

that her consequent difficulties with employment, including her eventual disability retirement, directly resulted from these emotional problems. The subsequent problems with employment are a likely result of the emotional damage done by the original injury, and Gibbons is entitled to recover for these harms.

## 8. Liability

■■■ We find sufficient grounds, based on expert testimony, learned treatises, and all other evidence presented, for concluding that the attack against Gibbons in February 1992 caused her PTSD and depression. Gibbons may have been more susceptible to these injuries due to her history of depression as well as her need for medication due to particular physical ailments. However, the common law rule is that a tortfeasor takes a victim as he finds that victim, and is liable for the expenses incurred by that particular person, not for what may have been incurred by another. *Vaiti v. Tuiolemotu*, 19 A.S.R.2d 71, 73 (Trial Div. 1991). The evidence indicates that the unfortunate attack upon Gibbons caused her emotional injuries. Even if she were more susceptible than the average person to become depressed because of that tortious injury, the tortfeasor ASG is still liable for the resultant damages.

## 9. Calculation of Special Damages Re Emotional Injuries

### (a) THERAPY AND MEDICATION

■■■■ Gibbons seeks to recover the cost of the treatment she has received for her emotional injuries. Tort plaintiffs may recover medical and related treatment reasonably necessary to minimize an injury or the pain or disability that results from it. DAN B. DOBBS, LAW OF REMEDIES § 8.1(3), at 650 (1993). We find Gibbons' therapy to have been reasonably necessary to treat the PTSD and depression resultant of the assault in question. We further find that the antidepressants used by Gibbons, some ineffective, were reasonable attempts at treatment. Gibbons may thus recover for the reasonable cost of her therapy, including the cost of her antidepressants. *See Lasha v. Olin Corp.*, 625 So. 2d 1002, 1006 (La. 1993) (including costs of exacerbation of depression in damages).

Evidence was presented pertaining to the cost of therapy for the period between February 16, 1992, and 1999. Plaintiff has summarized the charges for psychotherapy but not for medications, as being $83,560.00. (Ex. 14.) We award to Gibbons this amount.

48

(b) LOST WAGES

■ Lost wages, both past and future, are allowed in cases of emotional injury that renders a plaintiff unable to work. In *Goddhardt v. Nat'l R.R. Passenger Corp.*, 191 F.3d 1148, 1159 (9th Cir. 1994), for example, the court awarded damages when the plaintiff was unable to work in the future due to PTSD that was caused by sexual harassment. Gibbons is therefore entitled to both past and future earnings lost as a result of the attack against her and her ensuing emotional injuries.

Accountant and member of the American Samoa Bar Association, Daniel R. King, testified as to his computations of lost wages, lost leave, lost future wages, and lost retirement pension. (Ex. 8.) We accept his computations for lost past and future wages as well as retirement pension, as totaling $809,449.70.

■ A party's recovery for lost earnings is reduced by the amount actually earned by the plaintiff. *Coffin v. Bd. of Supervisors*, 620 So. 2d 1354, 1366-67 (La. 1993); *Hood v. Mercier*, 523 A.2d 572, 574 (Me. 1987); *Ray v. Dep't of Soc. Servs.*, 401 N.W.2d 307, 312 (Mich. 1986). Gibbons worked for approximately six months as a receptionist in 1995, approximately two years after her disability retirement. Gibbons' recovery for lost wages, $809,449.70, should therefore be decreased by the amount she earned in her job as a receptionist.

(c) VACATION AND SICK LEAVE

There is some uncertainty as to the terms governing the extent to which Gibbons may recover for vacation and sick leave. No evidence has been introduced as to the terms of her employment agreements with the United States or ASG regarding this issue. Such terms are necessary to inform the basis upon which this Court may award recovery. *See, e.g., Sebren v. Millers Mut. Fire Ins. Co.*, 182 So. 2d 99, 101 (La. App. 1966); *Siemes v. Englehart*, 346 S.W.2d 560, 564 (Mo. App. 1961); *Beck v. Edison Bros. Stores, Inc.*, 657 S.W.2d 326, 331-32 (Mo. App. 1961).

Plaintiff has provided the calculations and testimony of Daniel R. King regarding compensation for vacation and sick leave throughout the years 1992 through 1995. (Ex. 8.) His formulation includes two components of "lost leave." First is the value of total sick and vacation leave benefits that Gibbons lost because she was not on pay status ($10,506.18). Second is the total sick and vacation leave she used in excess of a normal amount due ($27,135.24). Such remuneration is counter-intuitive to the Court, because it double-pays Gibbons for annual leave lost in addition to leave taken, and furthermore aggregates sick and annual leave in a way not contemplated by the laws and regulations of American Samoa, and

perhaps neither by Gibbons' employment contract or the relevant federal employment regulations. The Court cannot, therefore, accept Mr. King's calculations, and instead will reformulate the economic damage portion for vacation and sick leave according to the applicable laws of American Samoa regarding its contract workers. These results are presented in the following table:

## ANNUAL LEAVE

| | 1992 | 1993 | 1994 | Total |
|---|---|---|---|---|
| Normal Earned | 208 | 208 | 208 | 624 |
| Normal Used | 168 | 168 | 168 | 504 |
| Normal Unused Leave | 40 | 40 | 40 | 120 |
| | | | | |
| Actually Earned | 208 | 168 | 80 | 456 |
| Actually Used | 126 | 426 | 0 | 552 |
| Actual Unused Leave | 82 | -258 | 80 | -96 |
| | | | | |
| Rate of Pay | $38.48 | $40.26 | $42.14 | |

Compensation for Difference = 120 hrs x $42.14 = **$5,056.80**

## SICK LEAVE

| | 1992 | 1993 | 1994 | Total |
|---|---|---|---|---|
| Normally Earned | 104 | 104 | 104 | 312 |
| Normally Used | 80 | 80 | 80 | 240 |
| Normal Unused Leave | 24 | 24 | 24 | 72 |
| | | | | |
| Actually Earned | 104 | 84 | 40 | 228 |
| Actually Used | 8 | 496 | 0 | 504 |
| Actual Unused Leave | 96 | -412 | 40 | -276 |

i. *ANNUAL LEAVE*

Remuneration of annual leave is governed by A.S.C.A. § 7.1203, which states: "payment of money in lieu of leave shall not be allowed except on termination of employment." Title 4 of the Administrative Code further proscribes the terms under which Gibbons would have collected annual leave had she stayed on as a contract worker on pay status. Specifically, A.S.A.C. §4.1005(a)(3) limits the amount of the lump sum for which a contract specialist may be paid to a "maximum of 60 days of unused, accumulated annual leave, computed at the salary then in effect."

Under normal conditions, assuming Gibbons terminated her contract at

the beginning of 1995, she would have been compensated for the accumulated annual leave not taken while on contract, for up to 60 days. Gibbons would have earned 208 annual hours per year. Plaintiff's expert states that Gibbons would normally have used 168 hours per year. As shown in the chart, she would thus have had 40 hours per year carried over to the next, totaling 120 hours by termination in 1995.

What actually happened, however, is that in 1993, Gibbons earned only 168 hours per year annual leave and used 426, thus taking an excess of 258 hours. But in 1992 and 1994, Gibbons earned more leave than she used, and accumulated leftover leave of 82 and 80 hours, respectively. Subtracting the excessive leave used in 1993 from the accumulated leave from 1992 and 1994, it turns out that Gibbons used an excess of 96 hours more annual leave than she had earned.

To compensate Gibbons for the injuries for which tortfeasors are liable is to restore her to the situation that she would normally have occupied had the tort not occurred.[2] By her own estimates, if it were not for the attack, Gibbons would have ended her term in 1995 with 120 accumulated unused hours. She is thus due compensation for these hours, in addition to the excess 96 days she took due to the injury (120 + 96 = 216). Her total economic damages for annual leave would thus total $5,056.80, which is the 216 hours at the 1994 rate, i.e. the "salary then in effect." A.S.A.C. §4.1005(a)(3).

ii. *SICK LEAVE*

Plaintiff's figures calculate remuneration for used sick leave on the presumption that plaintiff should be paid for ASG's fault in causing the sickness necessitating leave. Such a presumption is legally substantiated where plaintiff loses a benefit she would have had without the injury. *See, e.g., Sebren*, 182 So.2d 99. However, a number of muddling issues make such clean logic inapplicable to this case.

First, the employment statute of American Samoa does not, under normal circumstances, allow plaintiff to collect for unused accumulated sick leave. A.S.C.A. §7.1202(d) governs sick pay, or compensation for the unused accrued sick leave of government employees. Title IV of the administrative code does not address remuneration for unused sick leave

---

[2] See RESTATEMENT (SECOND) OF TORTS § 901 cmt. A (1965). This states, "[w]hile the law of contracts gives to a party to a contract as damages for its breach an amount equal to the benefit he would have received had the contract been performed. . ., the law of torts attempts primarily to put an injured person in a position as nearly as possible equivalent to his position prior to the tort." *See also* 22 AM. JUR. 2D *Damages* § 128.

51

of contract specialists, probably because of the high minimum standard set by the A.S.C.A. A.S.C.A. §7.1202(d) states in relevant part:

> Employees terminated for reasons other than retirement, [and] employees who are medically separated . . . are entitled to compensation for unused accrued sick leave at the rate of 50 percent of sick leave in excess of 239 hours.

This provision raises the issue of whether or not Gibbons may collect sick pay against contrary statutory policy.

Under normal circumstances, Gibbons would have earned 104 hours of sick leave per year, and according Mr. King's estimation, would have used 80 hours of this amount. She would thus normally have accumulated 24 unused hours a year, which over three years would total 72 hours. Therefore, under normal circumstances, Gibbons would only have accumulated 72 hours of sick leave. This would not have qualified her for compensation upon termination, since A.S.C.A. § 7.1202(d) requires a minimum of 239 unused, accumulated hours. The statute would not have allowed Gibbons sick leave pay under normal circumstances of termination, and does not found a basis for doing so under exceptional ones.

■ Second, it seems that Gibbons used more benefit than she would have had without the injury. Specifically, she took sick leave in excess of what she normally would have taken (276 excess hours actually used plus the 72 excess hours normally unused results in 348 hours more benefit than she normally would have had). Courts have held that defendants are entitled to a setoff if the tortious conduct also confers a benefit on the plaintiff. *Turpin v. Sortini*, 643 P.2d 954, 961 (Cal. 1982). It thus might be argued that Gibbons now owes ASG a setoff for the excess sick leave she took. However, we are not confident that Gibbons "benefited" from the excess leave, since the evidence does not sufficiently show that she was paid for it. Further, as we have pointed out above, we cannot grant Gibbons damages for a sick pay benefit that she would not have had under normal circumstances. Since it is unclear whether Gibbons received a benefit from the tort, we are equally restrained from awarding ASG a setoff for that benefit.

In the absence of evidence or argument concerning the relevant federal statutes, the pertinent terms of Gibbons' employment contracts, and persuasive legal arguments to the contrary, we are governed by the strict standards of the government employment provisions of the American Samoa Code in transforming paid sick leave into its wage equivalent. Neither these provisions nor the relevant common law allows us to award plaintiff for sick leave.

## V. Apportionment of Fault/Joint and Several Liability

ASG argues that the Court should apportion damages according to level of culpability rather than finding ASG and the inmate joint and severally liable for Gibbons' entire damages. It contends that the Court should apportion only a small degree of fault to ASG because the inmate actually committed the assault while ASG committed only passive negligence.

Under the common law rule, the Court applied joint and several liability, and has sometimes continued to apply the doctrine since the adoption of comparative negligence. A.S.C.A. § 43.5101; *see, e.g., Euta v. Etimani,* 24 A.S.R.2d 139, 144 (Trial Div. 1993). The majority of jurisdictions continue to use joint and several liability in conjunction with comparative negligence. *See* W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS, ch. 11 § 67 (5th ed. 1984).

■ However, the Court has increasingly followed the minority view, which holds that apportionment among tortfeasors is appropriate when it is possible to ascertain the parties' relative liability. *See Masania`i v. The Country Club,* 2 A.S.R.3d 142, 145 (Trial Div. 1998); *Fiaui v. Faumuina,* 27 A.S.R.2d 36, 40-42 (Trial Div. 1994); *Saufo`i v. Am. Samoa Gov't,* 14 A.S.R.2d 15, 22 (Trial Div. 1991). For example, in *Fiaui,* the Court found that while joint and several liability is the general rule, apportionment is appropriate when "the plaintiff has suffered factually separable or divisible harm that can be allocated among tortfeasors with reasonable certainty." *Fiaui,* 27 A.S.R.2d at 40 n.1, 41. Such situations occur in cases of successive causation, when there is no concert of action between the parties and "the acts of two defendants occur at distinct different times and together produce harm." *Id.*

In *Masania`i,* the Court found that apportionment is appropriate when it is possible to ascertain and allot comparative liability to the parties involved. *Masania`i,* 2 A.S.R.3d at 145. The plaintiff in *Masania`i* was seriously injured in a fight that took place while he was intoxicated at the Country Club. The Court found the individual defendants who battered plaintiff jointly and severally liable for 50% of plaintiff's injuries, and apportioned 25% of the damages to the Country Club for allowing the plaintiff to enter the Country Club intoxicated, in violation of statute. *Masania`i,* 2 A.S.R.3d at 129. The Court also found plaintiff comparatively negligent, which decreased his recovery by 25%. *Id.* The Court, acknowledging that it was diverging from the majority viewpoint, found joint and several liability for parties who acted in tandem, but found that apportionment was appropriate for a separate party when the actions of the different parties "did not act in concert as part of one inextricable, continuous act." *Masania`i,* 2 A.S.R.3d at 144.

Under the recent case law, including *Fiaui* and *Masania`i*, it is appropriate for the court to apportion the damages for Gibbons' injuries between ASG and the inmate. Like the Country Club's negligence in *Masania`i* in failing to prevent an intoxicated person from entering the premises, ASG's negligence involves its failure to take the necessary precautions to prevent an inmate from escaping and attacking a member of the public. The resulting willful conduct by the prisoner was at a separate time and of a different type than ASG's actions, and did not occur as part of a single, joint act in concert with ASG.

██ Because of the more serious ramifications of ASG's negligence in this case which distinguish it from *Masania`i*, we find that one-third of Gibbons' damages occurred as a result of ASG's negligence, and two-thirds occurred as a result of the intentional acts of the prisoner. We apportion damages to ASG accordingly.

## VI. Reduction of Damages

### A. Failure to Mitigate

ASG states that the court should apportion some of the culpability for plaintiffs' damages to plaintiff. In support of this argument, ASG states that Gibbons did not always take her medication and that she had difficulty in therapy. The Court assumes that ASG intends this contention as an argument that Gibbons failed to mitigate her damages rather than an apportionment argument, since it would be nonsensical that plaintiff caused her own injuries. These issues were discussed *supra* with regard to causation, and were in fact primarily argued by ASG as issues of causation. It is therefore unnecessary to rehash them here. We simply note that the evidence presented indicates that Gibbons' difficulties in therapy, as well as her occasional failure to take her medication, were symptoms, rather than causes, of her depression. We find that Gibbons did not fail to mitigate her damages.

### B. Collateral Source Rule

ASG contends that Gibbons' damages should be decreased in the amount of health benefits she has received. It argues that the collateral source rule should not apply to cases against the government and that Gibbons should not be able to gain a windfall by receiving double recovery.

██ Under the collateral source rule, an injured party's compensation from a source independent of the tortfeasor is not deducted from damages otherwise collectable from the tortfeasor. *Interocean Ships, Inc. v. Samoan Gases*, 24 A.S.R.2d 108, 109-10 (Trial Div. 1993). The

collateral source rule applies in "virtually all tort cases", including cases against the government. *Id.*; *see also Manko v. United States*, 830 F.2d 831, 836-37 (8th Cir. 1987) (no reduction for Medicare and Social Security benefits to which plaintiff had contributed); *Helfend v. S. Cal. Rapid Transit Dist.*, 465 P.2d 61, 69 (Cal. 1970). The collateral source rule prevents a tortfeasor from benefiting from the fact that a plaintiff has received separate benefits as a result of the defendant's tort.

The only case cited by ASG in support of its position discusses the right of an insurer to sue after it has paid an insured, but does not state that the insured cannot also collect from the tortfeasor. *See Dillingham Tug v. Collier Carbon & Chem. Corp.*, 707 F.2d 1086, 1090-91 (9th Cir. 1983). Instead, the case supports the proposition that the collateral source rule applies when the insurance is independent of the tortfeasor. *Id.* Gibbons contributed to her health insurance, and this benefit is from independent sources. We see no reason to stray from the collateral source rule, and allow no reduction for money Gibbons received from these independent sources.

C. Income Taxes

According to ASG, Gibbons' recovery for lost wages should be reduced by the amount of past and future income taxes she would have paid had she been able to work. ASG argues that the failure to deduct income taxes would constitute punitive damages, which is not allowed recovery under the Government Tort Claims. A.S.C.A. § 43.1203(a). Gibbons claims that income taxes should not be deducted because the determination of future income tax is too speculative, and because such a reduction would shift the benefit of non-taxability of tort awards from the injured party to the tortfeasor.

There is a split of authority as to whether to deduct both past and future income taxes from awards. The view that it is improper to deduct at least future income taxes from damage awards probably used to be the majority rule. *See Girard Trust Corn Exch. Bank v. Philadelphia Transp. Co.*, 190 A.2d 293, 298 (Pa. 1963) (past and future income); *Beaulieu v. Elliot*, 434 P.2d 665, 671 (Ark. 1967) (future income only; allowed reduction for past income). These courts refused to deduct only future income taxes on the grounds that future taxes are too uncertain to predict, and that consideration of tax issues would take over the bulk of a lawsuit since so many factors need be considered. *Beaulieu*, 434 P.2d at 671-72; *Frankel v. United States*, 321 F. Supp. 1331, 1339 (E.D. Pa. 1970). Perhaps due to these concerns, many courts have found that deduction of income taxes is improper except when dealing with persons with high incomes, since income tax deductions for these persons could significantly affect their recovery. *See Kalavity v. United States*, 584

F.2d 809, 812 (6th Cir. 1978) (citing cases utilizing this rule).

In recent years, more courts have deducted both past and future income taxes from awards. *See generally* John E. Theuman, Annotation, *Propriety of Taking Income Tax into Consideration in Fixing Damages in Personal Injury or Death Action*, 16 A.L.R.4th 589 (1982). Many courts have now considered this issue in the specific context of the Federal Tort Claims Act, the federal law on which the Government Tort Liability Act, A.S.C.A. § 43.1201 et seq., is modeled. *See generally* Ethel R. Alston, Annotation, *Propriety of Considering Future Income Taxes in Awarding Damages under Federal Tort Claims Act*, 47 A.L.R.FED. 735 (1980).

■ Courts have increasingly found deductions for income taxes to be proper, primarily on the ground that plaintiffs will receive a windfall if they receive the taxes that would have otherwise been deducted from their income. These courts have found that plaintiffs would be overcompensated if they receive amounts that the government would have received had they continued to work. *Scott v. United States*, 884 F.2d 1280, 1285 (9th Cir. 1992); *Mosely v. United States*, 538 F.2d 555, 558 (4th Cir. 1976). Utilizing this reasoning, the Ninth Circuit has employed three steps in determining an award for economic loss under the Federal Tort Claims Act: "(1) compute the value of plaintiff's loss under state law; (2) deduct federal and state taxes from the portion for lost earnings; and (3) discount the total award to present value." *Shaw v. United States*, 741 F.2d 1202, 1205 (9th Cir. 1984). We agree with this reasoning, rule, and method.

■ We therefore find that deduction of past federal and state income taxes from the total recovery is proper. Calculation of these taxes is not speculative, and should be determinable without too much difficulty. Deduction of future federal and state income taxes is also proper. Gibbons' award should only include wages she would have received had she continued to work. Despite the imprecision inherent in determining future income taxes, the resulting recovery is likely to more closely resemble Gibbons' actual take-home wages than an award that fails to account for her taxes.

## VII. Conclusion

The damages for Gibbons' injuries in this case is summarized as follows:

1. In general damages:
 (a) $100,000 for pain and suffering.

2. In special damages:
 (a) $354 for medical expenses incurred in Honolulu,

(b) $83,560 for treatment of emotional injuries through September 2, 1999,

(c) $809,449.70 in lost past and future wages and retirement pension, subtracted by further-evidenced amount earned as a receptionist in 1995 and adjusted to account for past and future income taxes, and

(d) $5056.80 for lost leave.

Gibbons' ascertainable injuries thus total $998,420.50, which figure is to be decreased by the amount earned as a receptionist in 1995 and past and future income taxes. ASG will be liable for 33% of the resultant amount.

## VIII. Order

The Court orders a supplemental briefing from the parties to determine a final award for Gibbons' economic losses, addressing wages earned as a receptionist in 1995, a calculation of past and future income taxes, and lost leave. Gibbons shall submit a brief, including a new calculation of damages consistent with the findings of this court, not later than 20 days following the entry of this opinion. ASG shall file its reply brief, if it has one, not later than 10 days after plaintiff's brief is filed. Gibbons shall then have 5 days to respond to ASG's reply.

It is so ordered.