707 F.2d 1086
 1984 A.M.C. 1990
 DILLINGHAM TUG & BARGE CORPORATION, a corporation,
Plaintiff-Appellant and Cross-Appellees,
v.
COLLIER CARBON & CHEMICAL CORPORATION, a corporation,
Defendant-Appellee and Cross-Appellant.
UNION OIL COMPANY OF CALIFORNIA, Third Party
Plaintiff-Appellant and Cross-Appellee,
v.
NICKUM & SPAULDING ASSOCIATES, INC.; The Salvage
Association, Third Party Defendants-Appellees and
Cross-Appellants.
 Nos. 81-4494, 81-4538, 81-4540 and 81-4547.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 12, 1983.
Decided June 10, 1983.
 
 1
 John R. Pascoe, Forrest Booth, Hancock, Rothert & Bunshoft, San Francisco, Cal., for Dillingham Tug & Barge Corp.
 
 
 2
 Scott T. Pratt, Keesal, Young & Logan, Long Beach, Cal., for Collier and Union Oil.
 
 
 3
 Seth W. Morrison, Oles, Morrison, Rinker, Stanislaw & Ashbaugh, Seattle, Wash., David Van Hoesen, Williams, Van Hoesen & O'Connor, San Francisco, Cal., for Nickum & Spaulding Associates.
 
 
 4
 Norman B. Richards, Richard C. Brautigam, Marilee J. Allan, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for Salvage Ass'n.
 
 
 5
 Appeal from the United States District Court for the Northern District of California.
 
 
 6
 Before TANG and ALARCON, Circuit Judges, and KENYON,* District Judge.
 
 KENYON, District Judge:
 
 7
 All four parties to this action appeal from the district court's decision in this case. We affirm in part and reverse in part, 548 F.Supp. 691.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 
 8
 This case arises out of the sinking of the barge Columbia, which was owned by the Collier Carbon & Chemical Corporation, a division of the Union Oil Company (Union). The tower of the barge, the Dillingham Tug & Barge Corporation (Dillingham), initiated this action by suing Union for its towing fees. Union counterclaimed against Dillingham, alleging that its negligence caused the loss of the Columbia, and also filed a third party complaint against The Salvage Association (Salvage), Nickum & Spaulding (N & S), and Todd Shipyards alleging that their negligence contributed to the loss of the barge. Todd Shipyards settled before trial and is no longer a party to this action.
 
 
 9
 Union purchased the barge Columbia in the spring of 1976. Union wished to have the Columbia ocean towed from Galveston, Texas, to Portland, Oregon. The Columbia had been built as an inland barge, and Union intended to use it as an inland barge, but it was necessary to modify it somewhat so that it could survive the ocean tow. Union retained N & S to perform the naval architectural and marine engineering services necessary to allow the barge to make the ocean tow. N & S originally proposed that a hopper cover be built for the barge, to prevent it filling with water. However, this would have been very expensive, and so Union asked N & S if the barge could survive an ocean voyage without the hopper cover. N & S advised Union that it could, if the tie-down devices on the barge were strengthened.
 
 
 10
 Union's underwriters required the barge to be surveyed by a designated surveyor or salvage association. Union hired Salvage to perform the necessary survey. Salvage determined that the barge was seaworthy for the proposed tow, and issued the survey certificate required by Union's underwriters. As part of their survey, Salvage reviewed the calculations performed by N & S. Salvage also made recommendations for the tow, inter alia, that the maximum speed should be restricted to eight knots through the water, that the crew should check the barge periodically to insure that it was not taking on water, and that if it was, the water should be pumped out.
 
 
 11
 Union hired Dillingham to perform the tow. The towing contract required Dillingham to give "due regard" to Salvage's recommendations. The towing contract also required Union to maintain Hull and Machinery insurance on the barge to its full value naming Dillingham as an additional assured with loss payable to Union. The contract further required a waiver of subrogation against Dillingham, and stated that Union would look only to the insurance for recovery for any loss or damage to the barge. The Columbia was placed on Union's fleet Hull and Machinery policy, with the required waiver of subrogation against Dillingham, but also with a $1,000,000 deductible. The parties dispute whether Dillingham was informed of this deductible before or after the commencement of the tow, and the trial judge made no finding of fact on this issue.
 
 
 12
 The tow commenced on January 29, 1977. By the time the barge reached the Panama Canal, several feet of water had accumulated in the barge's hopper, but the towing crew did not pump it out. After leaving the Canal, the tow consistently exceeded the recommended speed of eight knots. On February 25, the tow encountered heavy seas, speed was reduced at this time, but the barge continued to take on water. After some time, and several speed reductions, the captain of the tug decided to head for Bahia Ballenas to pump out the barge. Bahia Ballenas was over one hundred miles away at this point, and the tug had to head into the northwesterly seas to reach it, while the port of Bahia Santa Maria was only about twenty miles away, and was due east of the tug and tow. Eventually, the captain changed course for Bahia Santa Maria, but it was too late, the straps on the barge gave way, the cargo tanks broke off the barge, and the barge was lost.
 
 
 13
 The trial court found that Dillingham, Salvage and N & S were liable for the loss of the Columbia, and apportioned their fault for the loss at 60%, 20% and 20% respectively. The Court further found that Union's recovery should be reduced by $1,000,000 for its failure to fully insure the barge, and that each defendant would be liable for its proportionate fault only.
 
 DISCUSSION
 
 14
 I. Effect of the Insurance Provision in the Towage Contract Between Dillingham and Union.
 
 
 15
 The towing contract entered into between Dillingham and Union contained a clause providing that Union would insure the Columbia to its full value with Hull and Machinery insurance. The insurance policy was to name Dillingham as an additional assured, with a waiver of right of subrogation against Dillingham. The provision also required Union to look solely to its insurance for the recovery of any loss or damage to the barge.
 
 
 16
 Union argues that this provision is invalid under Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955). In Bisso the Supreme Court held that exculpatory provisions in towing contracts were invalid. Union argues that the insurance provision in this contract is merely an indirect exculpatory clause, since it effectively seeks to shield Dillingham from any liability for the loss of the barge.
 
 
 17
 The Supreme Court's holding in Bisso was based on two public policy factors. The Court wished to discourage negligence by making wrongdoers pay for damage they cause, and the Court also wished to protect those in need of goods and services from being overreached by others who have the power to drive hard bargains.[1] Bisso dealt with a pure exculpatory clause. That is not the case herein, though, and the public policy factors key to the holding in Bisso do not carry the same weight in the case of an insurance provision like the one at hand. In fact, there are public policy considerations in favor of such provisions.
 
 
 18
 The Fifth Circuit has previously considered this issue in several cases.[2] In Fluor Western, Inc. v. G & H Offshore Towing Co., 447 F.2d 35 (5th Cir.1971), cert. denied, 405 U.S. 922, 92 S.Ct. 959, 30 L.Ed.2d 793 (1972), a cargo owner had been required to get insurance under a provision similar to the one in question. The court held that the provision was valid, finding several distinctions between it and the exculpatory provision in Bisso. First, the court stated that there was no absolute exculpation under the provision; if the cargo owner couldn't collect from the insurer he could sue the tower. Union argues that this distinguishes the present case, because the provision appears to eliminate any suits against the tower, whether the insurer pays or not. However, this is not at issue in this case; Union was paid by its insurers for the full value of the barge, minus the $1,000,000 deductible. Whether the provision could shield Dillingham from liability in the absence of such a payment need not be determined.
 
 
 19
 The Fluor Western court went on to note that the contract containing the insurance provision did not bind the underwriters; they bound themselves in a separate agreement, and it was they who would have to bear the loss. The court did not see how any overreaching in the towing industry could have affected the underwriters. The only possible adhesiveness in the contract with regard to the cargo owner was the requirement that he pay the premiums for the insurance, but the court found that public policy was not concerned with which party paid for the insurance.
 
 
 20
 Fluor Western was followed in Twenty Grand Offshore, Inc. v. West India Carriers, Inc., 492 F.2d 679 (5th Cir.), cert. denied, 419 U.S. 836, 95 S.Ct. 63, 42 L.Ed.2d 63 (1974). The court again noted that the provision in question did not shield the tower from all liability; he could still be liable for loss of use of the barge, or injuries to third persons. Similarly, in the case at hand, the Hull and Machinery insurance obtained would not have paid for loss of use, or injuries to third persons, so it did not shield Dillingham from all liability. Union notes that in Twenty Grand there were mutual insurance provisions; since both parties had to insure one another. Union claims that fact distinguishes the present case. However, in BASF Wyandotte Corp. v. Tug Leander, Jr., 590 F.2d 96 (5th Cir.1979), the court explicitly held that such mutuality was not required for the enforcement of such a provision.
 
 
 21
 We believe that the reasoning of the Fifth Circuit is sound, and that it is not against public policy to enforce an insurance provision in a towage contract. Furthermore, it is economically efficient to allow the enforcement of such provisions. The parties to a towage contract with such a provision are effectively insuring themselves under one policy against any loss due to the fault of either one of them, instead of each obtaining separate policies for this purpose. A single policy can be obtained cheaper than two individual policies. In the event of a loss, the same insurance company pays for the loss, despite who is at fault.
 
 
 22
 Union argues that even if such provisions are not invalid per se, this one should be held invalid because Union produced uncontradicted evidence of overreaching in the towing industry regarding such provisions. The trial judge found that there was no monopoly in the towing industry, and that there had been no overreaching by Dillingham. The evidence to which Union refers was testimony by an employee of Dillingham that he couldn't recall ever negotiating a contract without such a provision (RT 270-271), and that other major towing companies also used such provisions (RT 272-273). Union also relies on the testimony by a Union employee that Dillingham refused to delete the provision from the contract (RT 532-3, 1537-8). This evidence does not justify a finding that the trial court was clearly erroneous. We uphold the trial court's finding that Union failed to meet their burden of establishing the existence of overreaching.
 
 
 23
 Having decided that the insurance provision in the towage contract should be enforced, we must determine what effect it has in this case. While finding that the insurance provision was enforceable, the trial judge still allowed Union to collect from Dillingham for its negligence in losing the Columbia. We find this to be error.
 
 
 24
 Normally, the right to sue a party responsible for a loss passes to an insurer once the insurer has paid for the loss. The trial court found that in this case, since a right of subrogation against Dillingham had been waived, and the insurer could therefore not sue Dillingham, the right to sue Dillingham remained with Union. The trial judge went on to rule that, under the collateral source rule, Union's recovery against Dillingham would not be reduced by the amount it had received from its insurer.
 
 
 25
 We disagree with the trial court's ruling for two reasons. First, the insurance provision in question explicitly provided that Union would look "solely to its Hull and Machinery insurance for the recovery of any loss or damage to the Barge." To allow Union to collect from Dillingham for its negligence violates this provision, which we have found to be enforceable. Second, the collateral source rule only applies to money received from "wholly independent" sources. Union was required to purchase the insurance for Dillingham's benefit. Presumably, Dillingham gave up something in return. Therefore, the insurance payment was not a source wholly independent of Dillingham. In conclusion, to the extent that Union has been paid for its loss by its insurer, Union cannot now collect from Dillingham.
 
 
 26
 Since the policy under which Union insured the Columbia had a $1,000,000 deductible, Union's insurer did not pay for the full value of the barge. The trial court found that Union breached its agreement to insure the barge for its full value by insuring it with a $1,000,000 deductible, and concluded that Union therefore became a self insurer for this $1,000,000. We agree. Union argues that Dillingham either agreed to the deductible, or waived any objection to it. The contract provided that "[Union] shall maintain ... insurance on the barge to its full value in form and amount satisfactory to [Dillingham]". Union argues that "full value" merely meant last dollar coverage and did not rule out a deductible. While some deductible might have reasonably been anticipated under the contract, we do not believe that insuring the barge for half its value was insuring it to "full value".
 
 
 27
 Union also argues that Dillingham waived any objection to the deductible because it was informed of the deductible prior to the commencement of the tow, and did not object until after the sinking. There was a dispute in the testimony as to when Dillingham was informed of the deductible, and the trial judge did not make a finding as to whether Dillingham was informed before or after the commencement of the tow. The trial judge concluded that whether they had been informed just prior to the tow, or after it had begun they did not waive their objection to the deductible. There does not appear to be any basis for concluding that the trial judge was clearly erroneous in making this finding.
 
 
 28
 II. Towing Fees and Panama Canal Fees.
 
 
 29
 The towage contract provided that towage fees "shall be deemed earned by Dillingham upon commencement of the voyage even though at any stage of the venture thereafter the barge or tug be lost...." The trial court found that the contract contained an implied warranty to perform the services required in a workmanlike manner, following Fairmont Shipping Corp. v. Chevron International Oil Co., 511 F.2d 1252, 1259-60 (2nd Cir.), cert. denied, 423 U.S. 838, 96 S.Ct. 66, 46 L.Ed.2d 57 (1975). The court further found that Dillingham had breached this implied warranty, and was therefore not entitled to its towing fees. However, the trial court did find that Dillingham was entitled to be reimbursed for the Panama Canal fees it had paid for the tow. Both Dillingham and Union agree that there is no reason why the Panama Canal fees should have been treated any differently than the towage fees, and there does not in fact seem to be any basis for making such a distinction. Since there is ample evidence to support the trial court's finding that Dillingham breached the implied warranty to perform the tow in a workmanlike manner,[3] the trial court was correct in refusing to allow Dillingham to collect its towing fees, but it erred in allowing Dillingham to collect the Panama Canal fees.
 
 
 30
 III. The Liability of N & S and Salvage.
 
 
 31
 N & S was retained by Union to design certain modifications in the river barge Columbia for a one time ocean tow from Galveston to Portland. N & S originally proposed a cover for the open hopper of the barge, but, when Union complained about the expense of such a cover, N & S approved the elimination of such a cover, and instead recommended the addition of additional straps to hold the cargo tanks to the barge. N & S performed calculations indicating the stress on these straps with the hopper flooded in still water, and with the hopper empty in dynamic water conditions, but did not perform calculations as to the stress the straps would encounter with the hopper flooded in dynamic water conditions. The trial judge found that the failure to perform such calculations, or, if the calculations could not have been performed, the failure to inform Union of this fact, constituted negligence on the part of N & S.
 
 
 32
 The determination of negligence, as with other findings of fact by an admiralty trial court will not be reversed unless it is clearly erroneous. Alkmeon Naviera, S.A. v. M/V Marina L, 633 F.2d 789, 796 (9th Cir.1980). There was ample testimony by experts at the trial to support the trial judge's finding of negligence,[4] and so this finding must be affirmed.
 
 
 33
 However, mere negligence alone does not give rise to liability, rather, the negligence must have caused the injury. "Without proof of causation there can be no liability." Logsdon v. Baker, 517 F.2d 174, 175 (D.C.Cir.1975); " '... both negligence and causation must be proved before the plaintiff can have a verdict.' " Becker v. Colonial Parking, Inc., 409 F.2d 1130, 1137 (D.C.Cir.1969); " 'Negligence, in and of itself, is irrelevant in the absence of some causal connection with the injury.' " Slatinsky v. Bailey, 330 F.2d 136, 138 (8th Cir.1964). Causation, in this case, would necessitate a finding that, had the omitted calculations been performed, they would have demonstrated that the straps were not in fact sufficient for the contemplated voyage. The trial judge did make such a finding;[5] however, we believe that this finding was clearly erroneous.
 
 
 34
 In making this finding, the trial judge relied on post-accident computer printout results from a Coast Guard MMT-10 computer printout. This program was used to analyze stresses in conventional barges, but there was uncontradicted testimony from three experts that the program did not produce reliable results when applied to the modified Columbia.[6] It was clearly erroneous for the trial judge to base his finding on this concededly unreliable program.
 
 
 35
 N & S was not asked to turn the Columbia into an ocean-going barge; the modifications were only made to allow it to survive a single ocean voyage. The experts who testified at trial, including the expert called by Union, agreed that had Dillingham conducted the tow as they were advised to, the barge would have survived the voyage, and therefore the barge was properly designed for the voyage contemplated by the parties.[7] If the Columbia were properly modified for the purpose of the contemplated voyage, then any negligence on the part of N & S in failing to make certain calculations was not the cause of the barge's sinking; the barge was lost due to Dillingham's failure to conduct the tow properly.
 
 
 36
 Since the trial judge found Salvage liable solely for a failure to discover N & S's negligence during its review of N & S's calculations, this finding was also clearly erroneous, and therefore must be reversed.
 
 CONCLUSION
 
 37
 The judgments as to Salvage and N & S are reversed. As between Union and Dillingham, the insurance provision at issue is enforceable. Union is responsible for the $1,000,000 deductible under the policy. We reverse the district court, however, as to Dillingham's liability for the amount which the insurer paid Union; Union must look solely to its insurer for recovery. Finally, the district court correctly found that Dillingham was not entitled to collect its towing fees from Union, but erred in awarding Dillingham its Panama Canal fees.
 
 
 38
 AFFIRMED in part and REVERSED in part.
 
 
 
 *
 The Honorable David V. Kenyon, United States District Judge for the Central District of California, sitting by designation
 
 
 [1]
 Bisso, supra, 349 U.S. at 91, 75 S.Ct. at 632
 
 
 [2]
 The only other circuit which has considered this question found an insurance provision to be unenforceable, saying it had not been bargained for, without giving further explanation. PPG Industries v. Ashland Oil Co., 592 F.2d 138 (3rd Cir.1978), cert. denied, 444 U.S. 830, 100 S.Ct. 58, 62 L.Ed.2d 38 (1979)
 
 
 [3]
 It is undisputed that Dillingham towed the barge in excess of the recommended speed, and failed to pump water out of the barge's hopper when it had an opportunity to do so. In addition, when it became obvious that the barge was in trouble, the tug headed directly into the pounding seas toward a port over 100 miles away, when another port was available at a distance of only twenty miles
 
 
 [4]
 Allan T. Maris, Union's expert naval architect, testified that the calculations should have been performed, or that N & S should have informed Union that the calculations had not been performed. RT at 1324-1326. Richard A. Stearn, N & S's own expert naval architect, also admitted that these calculations should have been done (RT at 1745-46), and, that if any necessary calculations were unavailable, the barge owner should have been informed of this fact. RT at 1737
 
 
 [5]
 In Conclusion of Law No. 5, the trial judge stated that, "After the sinking, Mr. Nickum and Mr. Spaulding apparently were dissatisfied with the work and calculations their company performed prior to the sinking, as they had additional calculations performed on March 9th and 10th. These calculations showed the straps were not sufficient."
 
 
 [6]
 Gordon C. Snyder, N & S's naval architect who made the recommendations concerning the modification of the Columbia testified that the MMT-10 program made the assumption that there was a supporting saddle under each strap location. However, the Columbia, as modified, had eleven unsupported straps, and so did not fit the assumptions of the program. RT at 979-981. N & S's expert, Mr. Stearn, stated that the failure of the MMT-10 program to take into account the lack of saddles under the added straps led to an erroneous printout. RT at 1724. Finally, Mr. Maris, Union's own naval architect, testified that he would be "very suspicious" of some of the numbers produced by the MMT-10 program as applied to the modified Columbia, and that this would cause him to "question both the program and the input data into the program." RT at 1364-66
 
 
 [7]
 Mr. Stearn, N & S's expert, testified that the Columbia as modified, "could safely complete the tow under the proper weather conditions and with the proper precaution being used when there was a sea condition arising." RT at 1732. David J. Seymour, an expert naval architect called by Dillingham testified that had the barge's hopper been kept dry, it would have made the voyage easily. RT 123-124. Finally, Mr. Maris, Union's own expert, testified, in response to questions from the Court, that the Columbia, at the commencement of the tow, was reasonably fit to make the voyage with proper handling (RT at 1333), and that it could have successfully completed the voyage with proper handling. RT at 1340, 1389