**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

WESTERN TOWBOAT COMPANY,

*Plaintiff-Appellant/ Cross-Appellee,*

v.

VIGOR MARINE, LLC,

*Defendant-Appellee/ Cross-Appellant.*

Nos. 22-35195
        22-35217

D.C. No. 2:20-cv-00416-RSM

OPINION

Appeal from the United States District Court
for the Western District of Washington
Ricardo S. Martinez, District Judge, Presiding

Argued and Submitted February 17, 2023
Seattle, Washington

Filed October 31, 2023

Before: William A. Fletcher, Richard A. Paez, and
Lawrence VanDyke, Circuit Judges.

Opinion by Judge W. Fletcher;
Partial Dissent by Judge VanDyke

# SUMMARY[*]

## Admiralty Law

The panel affirmed in all respects but one the district court's judgment after a bench trial in an admiralty action brought by Western Towboat Co. against Vigor Marine, LLC; vacated an award of prejudgment interest; and remanded.

Vigor hired Western to tow a drydock, which was damaged in a storm off the coast of California. In an attempt to bring the drydock to shelter in Monterey Bay, Western's tug towed the drydock into the Monterey Bay National Marine Sanctuary, where it capsized and sank. Western sued Vigor, seeking recovery of the towing fee under its contract with Vigor and a declaratory judgment that it would not be liable for any damages or penalty sought by the government under the National Marine Sanctuaries Act (NMSA). Vigor counterclaimed for breach of contract and negligence by Western.

The panel affirmed the district court's grant of partial summary judgment to Vigor on the ground that Western was negligent as a matter of law in allowing the drydock to sink in the Sanctuary, and there were no material issues of fact regarding Western's lack of awareness of the legal consequences of allowing the drydock to sink there.

After a trial on the remaining claims, the district court denied both parties' contract claims and held that both had

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

been negligent. In a comparative negligence analysis, the district court found that Vigor was sixty percent negligent and Western was forty percent negligent, and it awarded Vigor $40,000. The panel affirmed the district court's holding that Vigor was entitled to recovery from Western of only the $100,000 that Vigor was out of pocket after reimbursement from its insurance carrier for funds it spent in seeking to mitigate damages possibly owed to the federal government under the NMSA. The panel also affirmed the district court's comparative negligence analysis.

Vacating the district court's award of prejudgment interest on the $40,000 award against Western, the panel held that interest should run from the date of Vigor's expenditures, rather than the date the drydock sank. The panel remanded to allow the district court to recalculate the prejudgment interest based on the correct date.

The panel held that Western waived additional arguments regarding a hold harmless provision and a percentage share provision in the tow agreement.

Dissenting in part, Judge VanDyke wrote that he agreed with the majority that Western waived its argument about being owed a partial contract fee. He disagreed with the majority's holding that Western waived the argument that under the tow agreement the parties agreed to hold each other harmless for any portion of the other's insurance deductible. Because Western's argument was both correct and not waived, Judge VanDyke would hold that that Western did not owe Vigor any compensation for Vigor's deductible payment, and he would not reach many of the remaining issues decided by the majority.

**COUNSEL**

J. Stephen Simms (argued), Simms Showers LLP, Baltimore, Maryland; Anthony J. Gaspich, Gaspich Law Office PLLC, Bainbridge Island, Washington; for Plaintiff-Appellant.

Molly J. Henry (argued), Schwabe Williamson & Wyatt PC, Seattle, Washington; David R. Boyajian, Noah Jarrett, and Adam P. Murray, Schwabe Williamson & Wyatt PC, Portland, Oregon; for Defendant-Appellee.

**OPINION**

W. FLETCHER, Circuit Judge:

Vigor Marine, LLC ("Vigor") hired Western Towboat Co. ("Western") to tow a drydock from Seattle, Washington, to Ensenada, Mexico, where it was to be broken down for scrap. While off the coast of California, the drydock was damaged in a storm. In an attempt to bring the drydock to shelter in Monterey Bay, Western's tug towed the drydock into the Monterey Bay National Marine Sanctuary (the "Sanctuary"). While in the Sanctuary, the drydock capsized and sank. Because the drydock sank in the Sanctuary, the parties were exposed to liability under the National Marine Sanctuaries Act of 1972 ("NMSA"), 16 U.S.C. §§ 1431–45c-1.

Western sued Vigor in federal district court in admiralty. Western sought to recover the towing fee under its contract with Vigor, and a declaratory judgment that it would not be liable for any damages or penalty sought by the government

under the NMSA.  Vigor counterclaimed, claiming breach of contract and negligence by Western.

The district court took great care in its handling of this case.  The court determined that any decision on the issue of liability under the NMSA would be premature and dismissed for lack of subject matter jurisdiction all claims under the NMSA.  *Western Towboat Co. v. Vigor Marine, LLC* (*Western Towboat I*), 544 F. Supp. 3d 1100, 1113–16 (W.D. Wash. 2021).  Neither party appeals that dismissal.  The court granted partial summary judgment to Vigor, holding that Western had been negligent as a matter of law in allowing the drydock to sink in the Sanctuary.  *Id.* 1126–28. After a trial on the remaining issues, the court denied both parties' contract claims and held that both had been negligent.  In a comparative negligence analysis, the court found that Vigor was sixty percent negligent and Western was forty percent negligent.  Limiting Vigor's recovery to forty percent of the $100,000 not reimbursed by Vigor's insurance, the district court awarded Vigor $40,000. *Western Towboat Co. v. Vigor Marine, LLC* (*Western Towboat III*), 575 F. Supp. 3d 1318, 1339 (W.D. Wash. 2021).

Both parties appealed.  We affirm in all respects but one. We vacate the award of prejudgment interest to allow recalculation by the district court.

## I.   Background

Vigor is a commercial shipyard in Washington State.  It owned a drydock, YFD-70, constructed in 1945.  A drydock is a floating enclosed basin that allows cleaning or repairing parts of a ship that would ordinarily be underwater.  *Dry Dock, International Maritime Dictionary* (2d ed. 1961). The ship enters the drydock through open gates while the

drydock is partially submerged. The gates are then closed and the water is pumped out of the drydock, leaving the entire ship exposed. *Id.*

In 2013, Vigor hired Heger Dry Dock, Inc. ("Heger") to perform an ultrasonic gauging survey of YFD-70. An ultrasonic gauging survey evaluates the steel's thickness. The purpose of the survey was to determine the drydock's continuing commercial viability. The survey showed impaired longitudinal stiffeners and "heavy corrosion" of portions of the drydock.

In 2015, the pump, two reach rods, and a valve broke on the drydock. Due to the cost of repair, Vigor determined it was no longer economical to maintain the drydock. Vigor sold the drydock to Amaya Curiel Corp. ("Amaya") for scrapping at a shipyard in Ensenada, Mexico. Due to dock constraints in Ensenada, Amaya and Vigor agreed to have the drydock towed to Ensenada rather than transported on the deck of a ship.

YFD-70 could be towed in two different configurations. First, it could be towed in a single piece, without disassembling the drydock. Second, its end sections could be separated and stacked on the center section, resulting in a three-piece tow. If a drydock is towed in the open ocean, high waves cause structural stress—"hogging" and "sagging." Such stress is reduced in a three-piece tow. U.S. Navy guidance specific to YFD-70 provides, "The dock has been designed to facilitate towing at sea. When towed, the end sections are stowed on the center section." U.S. Navy, *Floating Dry Docks YFD-68, YFD-69, YFD-70, YFD-71: General Information and Operating Manual* 4 (1944).

To replace YFD-70, Vigor arranged for a sister drydock that was subject to the same Navy guidance to be towed

through the ocean from Portland to Seattle. To determine whether that drydock, YFD-69, could be towed safely, Vigor hired Heger to conduct an engineering study. Heger did multiple computer simulations, towing YFD-69 in both the one-piece and three-piece configurations. Based on the simulations, Heger determined that YFD-69 could be towed in either configuration, with different restrictions depending on which configuration was used.

Western is a maritime towing company predominantly operating in Alaska and Washington. One of Vigor's naval architects, Daniel Keen, contacted Western's president, Bob Shrewsbury, for a price quotation to tow YFD-70 from Seattle to Ensenada. Despite the drydock's condition, Shrewsbury testified that he felt Western could tow it "at the right time of the year and in decent conditions."

Vigor and Western entered into a Standard Towage Agreement (the "Tow Agreement"). The agreement provided that Western would tow the drydock for $142,800 plus the cost of fuel (the "contractual fee"). The agreement provided that the tow would start on or about October 7, 2016. However, the agreement provided that the tow depended on favorable weather conditions. If favorable weather conditions did not exist by November 7, 2016, either party could reschedule the tow dates.

Vigor prepared YFD-70 for towing. As part of the preparation, Vigor hired Captain Richard Shaw from Bowditch Marine, Inc. to conduct a marine warranty survey and provide tow recommendations. Shaw found that Vigor had improved YFD-70 structurally and had outfitted it with proper equipment in preparation for the tow. He concluded that the tug and drydock were suitable for an ocean tow from

Seattle to Ensenada if there were a favorable weather forecast.

Shaw recommended restrictions designed to minimize stress on the drydock.  He recommended that the tow avoid seas with wave heights of greater than eight to ten feet, and that the tug not leave any safe port or sheltered water without first determining that the weather forecast conformed to these restrictions.  Shaw made no recommendation whether the drydock should be towed in one or three pieces.

Shaw's survey was the only examination of the drydock in preparation for the tow.  Vigor did not tell Shaw about Heger's 2013 ultrasonic gauging survey of the drydock. Neither Heger nor any other firm was asked to perform an engineering study on YFD-70 comparable to the study that had been performed on YFD-69 prior to its tow from Portland to Seattle.

A tow plan provides recommendations to a tug captain on how to perform a voyage.  Western created a tow plan for the YFD-70, which it amended after receiving Shaw's report.  The plan provided that an ocean-going tug, OCEAN RANGER, with Captain Stephen McGavock as master, would tow YFD-70 out of Puget Sound and past Cape Flattery, into the ocean.  The tug would then go south along the coast to Mexico.  McGavock testified at trial there were no realistic ports of refuge between Cape Flattery and San Francisco.

After an initial delay due to unfavorable weather conditions, the OCEAN RANGER left Seattle on October 17, 2016.  On October 19 and 20, while near the mouth of the Columbia River, the tug and tow encountered winds of twenty-five knots and wave heights between ten and twelve feet.  The tug and tow made it through this weather without

incident and continued south.  On October 21 and 22, off the coast of southern Oregon, waves reached as high as thirteen to fifteen feet.  The tug and tow again made it through without incident.  On October 24, a "major wind event" occurred between Point Arena and Bodega Bay, north of San Francisco, with wind speeds of over thirty knots and waves heights more than eleven feet.  On October 25, waves and wind remained high from Point Reyes to San Francisco.

On October 25, while slightly north of San Francisco, McGavock noticed that the drydock had a port bow list.  He contacted Shrewsbury, who in turn consulted Keen, Vigor's naval architect.  Shrewsbury and Keen suggested that the best course of action might be to bring the drydock into San Francisco Bay.  However, as the condition of the drydock deteriorated, McGavock believed it was unsafe to do so as it could sink and block the shipping channel into San Francisco Bay.

McGavock also expressed concern to Shrewsbury about the drydock sinking in the Greater Farallones National Marine Sanctuary west of San Francisco Bay.  The tug and tow left the Farallones Sanctuary in an attempt to reach Monterey, south of San Francisco Bay.  On the evening of October 25, McGavock brought the tow into the Monterey Bay Sanctuary.  Darkness and fog made it difficult to assess the condition of the drydock.  McGavock maintained the OCEAN RANGER's position in the Sanctuary that night, with a plan to assess the situation in the morning.  At the time, McGavock believed the drydock would stay afloat until morning.

At about two in the morning of October 26, the fog cleared enough to allow the crew to see that the drydock's condition had worsened.  Soon thereafter, the drydock began

to capsize. McGavock dumped the tow line and released the drydock in order to save the OCEAN RANGER and its crew. The drydock sank in the Sanctuary.

On January 19, 2021, the United States National Oceanic and Atmospheric Administration sent a letter to Vigor, Western, and Amaya informing them that YFD-70 had sunk in the Monterey Bay Sanctuary. According to the letter, the three could be responsible for damage to the Sanctuary, costs to assess the damage, and civil penalties under 16 U.S.C. § 1437(d).

In an attempt to mitigate damages, Vigor paid for a survey to locate the sunken drydock and assess damage to the Sanctuary. The survey cost $351,980.14. Combined with related expenses, Vigor calculated its costs to be $415,441.67. On advice of counsel, Western declined to cooperate with mitigation efforts.

## II. Procedural History

Western filed suit against Vigor in district court for the Western District of Washington in admiralty. Vigor answered and counterclaimed.

The parties brought cross motions for summary judgment. Western claimed that Vigor breached the Tow Agreement by failing to render a seaworthy tow and failing to pay for services rendered. Vigor claimed that Western had breached the Tow Agreement by failing to render reasonable assistance when the drydock developed a list. The district court denied summary judgment on both claims, holding that there were disputed material facts that needed to be resolved. *Western Towboat I*, 544 F. Supp. 3d at 1117, 1119. Vigor also argued that Western was negligent in allowing the drydock to sink in the Marine Sanctuary. The

court granted partial summary judgment on this issue, holding that Western had been negligent as a matter of law. *Id.* at 1125–28.

After a five-day bench trial, the district court ruled against Western on its claim for breach of contract, holding that Western had "breached its duty of prudent seamanship" in agreeing to perform the tow in mid-October. *Western Towboat III*, 575 F. Supp. 3d at 1337. The court also ruled against Vigor on its counterclaim for breach of contract, holding that Western had rendered reasonable assistance. *Id.* at 1338. The court further held that Vigor was negligent in failing to exercise diligence in rendering a seaworthy tow to Western. *Id.* at 1338–39. Applying comparative negligence analysis, the court found that Western was forty percent negligent because it had undertaken the tow in October and then allowed the drydock to sink in the Sanctuary rather than somewhere else. *Id.* at 1339. It found Vigor sixty percent negligent for failing to tender a seaworthy drydock. *Id.*

Vigor had been compensated by its insurance company for all of its mitigation expenditures except for a $100,000 deductible. In a post-trial ruling, the district court declined to apply the collateral source rule, holding that Western was not liable for Vigor's expenditures in excess of its non-reimbursed deductible. *Western Towboat Co. v. Vigor Marine, LLC* (*Western Towboat II*), 566 F. Supp. 3d 1095, 1101 (W.D. Wash. 2021). The district court awarded Vigor $40,000, based on Western's forty percent comparative negligence. *Western Towboat III*, 575 F. Supp. 3d at 1339.

Both parties appealed.

### III. Standards of Review

We review de novo summary judgment rulings. *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) (en banc). Summary judgment is appropriate if, when "viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact." *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 440 (9th Cir. 2017) (internal quotation marks omitted). Factual findings of a district court sitting in admiralty, including comparative negligence findings, are reviewed for clear error. *In re White Cloud Charter Boat Co.*, 813 F.2d 1513, 1517 (9th Cir. 1987). The application of the collateral source rule is reviewed de novo. *United States v. City of Twin Falls*, 806 F.2d 862, 873 (9th Cir. 1986), *rev'd on other grounds by Ass'n of Flight Attendants, AFL-CIO v. Horizon Air Indus., Inc.*, 976 F.2d 54, 551-52 (9th Cir. 1992). We review a district court's award of prejudgment interest for abuse of discretion. *Alkmeon Naviera, S.A. v. M/V Marina L*, 633 F.2d 789, 797 (9th Cir. 1980).

### IV. Discussion

The parties raise a number of arguments on appeal. We analyze them in turn.

#### A. Grant of Partial Summary Judgment to Vigor

The district court granted partial summary judgment against Western, holding as a matter of law that Western was negligent in allowing the drydock to sink in the Monterey Bay Marine Sanctuary. The district court wrote:

> [T]he record only indicates Western's intention that the OCEAN RANGER wait in deeper water until daylight, without regard to

where the vessel sat in relation to the boundaries of the Marine Sanctuary. Despite Western's recognition that the Drydock was sinking as the OCEAN RANGER headed away from San Francisco Bay, the record reflects no understanding by Western that the Drydock was inside a marine sanctuary at the time it sank, nor any awareness as to the practical consequences—whether legal, environmental, or economic—of releasing the tow line in that location.

*Western Towboat I*, 544 F. Supp. 3d at 1127 (internal citations omitted).

On reconsideration, the district court recognized that there was evidence that McGavock knew he was in the Sanctuary. But it reaffirmed its holding that Western was unaware of the consequences of allowing the drydock to sink in the Sanctuary. It therefore left intact its partial summary judgment against Western. *See Western Towboat Co. v. Vigor Marine, LLC*, No. C20-0416-RSM, 2021 WL 2584911, at \*2 (W.D. Wash. June 23, 2021) ("[I]t remains undisputed that Captain McGavock failed to understand the hazards presented by that sanctuary to a tug towing a sinking drydock.").

Western argues that there were material issues of fact that precluded the grant of partial summary judgment. We agree with the district court that there was no evidence in the record that anyone at Western, including McGavock, was aware of the legal consequences of allowing the drydock to sink in the Monterey Bay Marine Sanctuary. We therefore affirm the grant of partial summary judgment to Vigor.

## B.  Collateral Source Rule

Vigor sought recovery of the $415,441.67 it spent in seeking to mitigate the damages that Vigor, Western, and Amaya might owe to the federal government under the NMSA.  The district court held that claims relating to future potential damages and penalties owed to the government under NMSA were so speculative that the court had no subject matter jurisdiction over them.  *Western Towboat I*, 544 F. Supp. 3d at 1114–15.  The parties do not dispute that conclusion.  However, Vigor's expenditures to mitigate damages were not speculative.

Vigor was reimbursed by its insurance carrier for all but $100,000 of its expenditures.  Vigor argued under the collateral source rule that reimbursement from Western should be calculated based on the full $415,441.67.  The district court held that the collateral source rule did not apply, and that any reimbursement from Western should be calculated based only on the $100,000 for which Vigor was out of pocket.  *Western Towboat II*, 566 F. Supp. 3d at 1101.  We agree.

The collateral source rule allows a tortfeasor to be assessed the full amount of damages when the victim receives compensation from a source collateral to the tortfeasor.  *Gypsum Carrier, Inc. v. Handelsman*, 307 F.2d 525, 534 (9th Cir. 1962).  The collateral source rule applies in admiralty cases.  *The Atlas*, 93 U.S. 302, 310 (1876); *Gypsum Carrier*, 307 F.2d at 535.  The rule applies only to money received from a "wholly independent" source.  *Dillingham Tug & Barge Corp. v. Collier Carbon & Chem. Corp.*, 707 F.2d 1086, 1091 (9th Cir. 1983) (internal quotation marks omitted).  To determine if a source is wholly independent, we look to "'the purpose and nature of the fund

and of the payments,' and not merely at their source." *Russo v. Matson Nav. Co.*, 486 F.2d 1018, 1020 (9th Cir. 1973) (quoting *Gypsum Carrier*, 307 F.2d at 534 n.31).

Vigor's insurance policy was not a wholly independent source. The Tow Agreement required Vigor to purchase insurance, and Western determined its contractual fee based in part on Vigor's doing so. As the district court correctly noted, agreed payments to Vigor were calculated "pursuant to insurance policies that Vigor was required to procure under the Towing Agreement." *Western Towboat II*, 566 F. Supp. 3d at 1101. The collateral source rule therefore does not apply.

## C.  Comparative Negligence

After trial, the district court held that neither Western nor Vigor could recover for breach of the Tow Agreement. However, with respect to Vigor's $100,000 out-of-pocket expenditures in seeking to mitigate damages, it held that both Western and Vigor could be held liable for negligence.

The district court held that both Western and Vigor were negligent. Western was negligent in two respects. First, "Western's negligence led to the Drydock sinking inside the marine sanctuary when it breached its duty to navigate." *Western Towboat III*, 575 F. Supp. 3d at 1338. Second, "Western's negligence in agreeing to undertake the specialty tow in mid-October with only one realistic port of refuge after Cape Flattery contributed to the Drydock's sinking." *Id.* Vigor was negligent in failing to exercise diligence "in tendering a seaworthy vessel to Western." *Id.* Vigor also "caused the Drydock to undertake a voyage where it would likely hit conditions in excess of weather conditions the 71-year-old Drydock could withstand. Vigor's decision therefore contributed to the Drydock's sinking when it hit

the unpredicted storm on October 24." *Id.* The court held that Western was forty percent negligent and that Vigor was sixty percent negligent. *Id.* at 1339.

Western and Vigor both argue that the district court erred in its comparative negligence analysis, but we find no clear error.

### D. Other Objections

### 1. Prejudgment Interest

The district court awarded prejudgment interest on the $40,000 award against Western, running from the date the drydock sank rather than from the date Vigor made its expenditures. *Western Towboat III*, 575 F. Supp. 3d at 1339. Western objects, contending that interest should run from the date of the expenditures. Vigor does not dispute that interest should run from the date of the expenditures.

Instead, Vigor argues that the invited error doctrine applies on the ground that Western submitted the proposed final judgment containing the interest award to which it objects. *See, e.g.*, *Sovak v. Chugai Pharm. Co.*, 280 F.3d 1266, 1270 (9th Cir. 2002). However, in its Findings of Fact and Conclusion of Law, the district court selected the wrong date for calculating prejudgment interest. After the district court did so, Western submitted its proposed final judgment using that date. Western thus did not invite the error. We vacate and remand to allow the district court to recalculate the prejudgment interest based on the correct date.

### 2. Hold Harmless Agreement

Section 8 of the Tow Agreement provided that the parties "shall be separately responsible for, and shall indemnify and hold harmless each other from and against . . . all loss,

damage, expenses, claims, liabilities and suits arising out of or relating to property owned by it." The district court held that this provision requires the parties to hold each other harmless only for injury to "their own property." *Western Towboat I*, 544 F. Supp. 3d at 1121. That is, "parties are responsible for claims arising out of or relating to their own property such that Vigor is barred from recouping loss of the Drydock, but not from recouping costs incurred as a result of Western's negligent injury to third parties." *Id.*

Western argues to us that "the parties specifically agreed in the Tow Agreement not to seek a negligence recovery for any insurance deductible." Vigor spent the non-reimbursed $100,000 in an attempt to mitigate damages potentially owed to the United States—a third party to the Tow Agreement. In making its hold harmless argument under the agreement, Western does not challenge the district court's ruling that the hold harmless provision does not apply to claims brought by third parties. Western has therefore waived the argument that it cannot be required to reimburse Vigor for all or part of its $100,000 deductible. *See Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994).

### 3. Percentage Share of Contractual Fee

Section 1(A) of the Tow Agreement provides Western shall be paid, even if the tow is lost, "except to the extent" the loss arises from Western's negligence. Western argues that under this provision it is entitled to sixty percent of the contractual fee because it was only forty percent at fault.

Western never made this argument to the district court. We generally do not entertain arguments on appeal that were not presented to the district court. *Villanueva v. California*, 986 F.3d 1158, 1164 n.4 (9th Cir. 2021). Western has given no reason why we should do so in this case.

## V.  Conclusion

For the reasons provided above, we affirm the district court in all respects by one.  We vacate the award of prejudgment interest and remand for calculation based on the correct date.  The parties shall bear their own costs on appeal. *See* Fed. R. App. P. 39(a)(4).

**AFFIRMED in part, VACATED in part, and REMANDED**.

---

VANDYKE, Circuit Judge, dissenting in part:

I agree with the majority that Western waived its appeal argument about being owed a partial contract fee.  But the majority is incorrect that Western waived the argument that under the tow agreement the parties agreed to hold each other harmless for any portion of the other's insurance deductible.  As the majority acknowledges, Western argued in its opening brief that section 8 of the agreement requires the parties to "look solely" to their own insurance for coverage of "any" and "all" losses they might incur, including payment of their own insurance's deductibles. Western's argument that any and all deductible payments for a party's insurance coverage were the "sole[]" responsibility of the party who purchased that insurance necessarily includes any deductible payments paid out because of claims brought by third parties.  Because Western's section 8 argument is both correct and not waived, I would hold that Western does not owe Vigor any compensation for Vigor's deductible payment and would not reach many of the remaining issues the majority unnecessarily decides.  I thus respectfully dissent in part.

### I. Western Towboat Waived the Argument as to the Partial Recovery of the Contract Fee by Not Raising It Before the District Court.

The majority correctly concludes that Western waived its argument about recovering part of its contract fee. Western argued in district court that it is owed the entirety of its contract fee, and on appeal it now instead argues only that it is owed a portion of that fee comparable to Vigor's share of the negligence that resulted in the drydock sinking. This is an entirely new argument made under section 1(A) of the agreement, and as the majority correctly observes, this court generally does not consider arguments raised for the first time on appeal. *Villanueva v. California*, 986 F.3d 1158, 1164 n.4 (9th Cir. 2021).

### II. Western Did Not Waive the Argument that It Cannot Be Required to Reimburse Vigor for All or Part of Its Insurance Deductible.

I disagree, however, with the majority's conclusion that Western waived a challenge to the district court's ruling that section 8 of the towing agreement holds the parties harmless only for injury to their own property, i.e., not for claims brought by third parties. Across four pages of its opening brief, Western argued that the district court was wrong, because section 8 contains a knock-for-knock provision that requires the parties to "look solely" to their insurances for coverage of *any* losses they might incur "rather than maintain claims against each other based on negligence or fault." And Western specifically argued that this global reciprocal hold harmless rule expressly applies to "*all* … deductibles … applicable to such insurance." (Emphasis added).

The majority appears to find great import in the fact that Western argued that "the parties specifically agreed in the Tow Agreement not to seek a negligence recovery for any insurance deductible," without expressly explaining that by saying "*any* insurance deductible" it really meant "any"—and thus includes an insurance deductible paid out as a result of a claim brought by a third party. But finding waiver based on that is wholly unwarranted. If section 8 universally holds the parties reciprocally harmless for "*any* insurance deductible" paid by the other party, as Western expressly argued, it necessarily holds the parties harmless for the subset of insurance deductibles paid as a result of third-party claims. That is inherent in the plain meaning of "any," which means "every" or "at all." *The Merriam-Webster Dictionary* 47 (1990). Using the majority's flawed and illogically parsimonious reasoning, one might just as well conclude that when Western made its universal argument about the contract's allocation of responsibility for paying "any" deductible, it neglected to argue that "any insurance deductible" includes deductibles paid out on Tuesdays, or deductibles paid out if the drydock were to sink in water deeper than 100 feet. "Any" and "all" means what everyone knows those words mean, and Western therefore did not waive the argument that the district court erred in requiring Western to reimburse Vigor for part of Vigor's deductible.

### III. Because Section 8 Contains a Pertinent and Dispositive Knock-for-Knock Provision, I Would Hold that Western Owes Nothing to Vigor and Would Not Reach the Other Three Issues the Majority Decides.

Because the majority concludes that Western waived its argument about Vigor's responsibility for its own insurance deductible, the majority never decides that argument. I

would, and I would conclude that Western is correct that section 8 holds it harmless for any portion of Vigor's insurance deductible.

The plain text of section 8 allows for no other conclusion.  Start with section 8(A), where the parties note that:

> It is the intent of the parties that the insurance identified in this section cover *all* losses, damages, liabilities and suits incident to the services being provided, and that the parties shall look *solely* to such insurances … rather than maintain claims against each other based upon negligence or fault.  To that end, the parties agree to procure and maintain the following insurances, to promptly submit and prosecute all claims against such insurances, *and to look solely to such insurances for recovery*.

(Emphases added).   Section 8(A) makes clear that the insurances identified in subsequent subsections should cover "all" losses incident to the drydock tow, and that the parties must "look solely" to those insurances for recovery of losses.

Section 8(B) then makes clear that the parties are each responsible for their own deductibles for the insurances they are required to purchase under the contract, including policies for "pollution and environmental liability insurance, including coverage for damages [and] cleanup and restoration costs."  Then section 8(B)(3) states clearly: the party "required to procure and maintain an insurance as above shall be *solely* responsible for the payment of *all* … deductibles … applicable to such insurance."  (Emphases

added)**.** In other words, section 8(B) expressly provides that Vigor is *solely* responsible for *all* deductibles it might have to pay out under its own required environmental liability insurance policy that covered its site survey of the marine sanctuary.

The contract language is clear enough, and there is nothing inappropriate about the parties' agreement thus allocating responsibility. Such knock-for-knock provisions have long been common in contracts for various risky maritime undertakings. *See* Graydon S. Staring, *Meting out Misfortune: How the Courts Are Allotting the Costs if Maritime Injury in the Eighties*, 45 La. L. Rev. 907, 917 (1985). And because proper analysis of Western's unwaived argument about Vigor's insurance deductible disposes of many of the other issues addressed by the majority, rendering analysis of those issues superfluous, I would not decide those unnecessary issues in this published opinion.

*First*, the majority affirms in section IV(A) of its opinion the district court's grant of partial summary judgment against Western on the issue of whether Western was negligent in allowing the drydock to sink in the marine sanctuary. But because the only money that Vigor is out of pocket is its $100,000 insurance deductible, and section 8 of the contract precludes Vigor from recovering compensation from Western for that deductible payment regardless of whether Western was negligent, the majority addresses that issue unnecessarily.

*Second*, the majority affirms in section IV(B) of its opinion the district court's holding that the collateral source rule does not apply to all the roughly $415,000 Vigor spent seeking to mitigate any damages the United States might be owed under the National Marine Sanctuary Act, 16 U.S.C.

§ 1431, on the grounds that Vigor's insurance proceeds were not wholly independent from Western. *See Dillingham Tug & Barge Corp. v. Collier Carbon & Chem. Corp.*, 707 F.2d 1086, 1088 (9th Cir. 1983).

The majority correctly notes that determining whether or not the proceeds are wholly independent requires this court to look to "the purpose and nature of" the proceeds, as well as to their "source." *See Russo v. Matson Nav. Co.*, 486 F.2d 1018. 1020 (9th Cir. 1973).   That typically includes examining at least whether the insurance policy provides for waiver of subrogation, lists the tower as a second insured, or contains other terms written for the tower's benefit.   2 Thomas J. Schoenbaum, Admiralty and Maritime Law § 12:9 (2d ed. 2022); George W. Nowell, *Subrogation: Selected Bars, Waivers and Pitfalls*, 7 U. of S.F. Maritime L.J. 421, 459–60 (1995) (additional considerations).   The examination of the policy language must be punctilious because public policy concerns unique to the towing industry strictly limit towers' ability to offset *any* liability for their negligence via outside insurance. *Bisso v. Inland Waterways Corp.*, 349 U.S. 85, 91 (1955); *McLean v. Runyon*, 222 F.3d 1150, 1156 (9th Cir. 2000); *see* Charles S. Donovan, *Exculpatory and Benefit of Insurance Clauses in Towage and Pilotage*, 70 Tulane L. Rev. 605, 605–06 (1995).

Yet the parties agree that the record does not even identify the *source* of the proceeds, that is, which particular insurance policy paid Vigor.  The district court sprang over that gap in the record with a "logical leap" to "surmise" that the paying policy must be one whose terms not only mirror what section 8 requires but are also limited in all relevant ways to *only* what section 8 requires.  The majority adopts that same approach, but it need not do so.  We need not even reach the question of whether the collateral source rule

applies here because the valid knock-for-knock provision in section 8 of the contract precludes Vigor from obtaining any compensation from Western. I therefore would not reach the issue.

*Third*, the majority holds in section IV(C) of its opinion that the district court did not commit clear error when it apportioned liability for negligence with respect to Vigor's deductible expenditure 40 percent to Western and 60 percent to Vigor. Again, that is unnecessary given that section 8 renders any such division irrelevant. Whether Western is 99 percent or 1 percent contributorily negligent, under the parties' agreement it owes Vigor nothing for Vigor's own insurance deductible.

*Finally*, the majority's conclusion that the district court's erred in calculating prejudgment interest is correct. But it is also unnecessary, because if the majority had properly addressed the contract's assignment of responsibility for paying insurance deductibles, Western would owe Vigor nothing, and thus owe no prejudgment interest.